·DAISY L. MARTIN, Appellant, v. BANKERS LIFE COMPANY, Des Moines, Appellee.

No. 41804.

SEPTEMBER 26, 1933.

Campbell & Campbell, for appellant.

R. B. Alberson, J. P. Lorentzen, and Cross & Hamill, for appellee.

DONEGAN, J.—Harry S. Martin was manager of several farms belonging to Mr. Maytag, of Newton, Iowa. He also owned a farm of his own which was operated by an employee under his management. Prior to the year 1930, the defendant-appellee had issued to Harry S. Martin two policies of life insurance for $6,000 and $4,000, respectively, and both policies provided for double indemnity in case the death of insured should be caused by an accident. The beneficiary named in both of these policies was Daisy L. Martin, the wife of insured. Said Harry S. Martin died on the 12th day of June, 1930. The defendant paid the original sum provided in both policies, but refused to pay the double indemnity on either of said policies. Thereupon, the widow and beneficiary, Daisy L. Martin, instituted this action to enforce the payment of the double indemnity provision of the policies, alleging that the death of the insured resulted from accident. The defendant admitted its corporate existence, that the policies sued upon had been issued by it, that Harry S. Martin had died, and that it had paid the beneficiary in said policies the original sums provided therein. Defendant denied each and every other allegation contained in plaintiff's petition. Trial was had to a jury. At the close of plaintiff's evidence, the defendant moved the court to direct the jury to return a verdict in favor of the defendant, which motion was overruled. Thereupon, the defendant presented its evidence, and at the close of defendant's evidence it

renewed its motion and again asked the court to direct the jury to return a verdict in its favor. The defendant's motion for a directed verdict was sustained by the court, a verdict rendered in favor of defendant, and judgment entered thereon. The plaintiff appeals.

Appellant contends that the evidence offered by her is sufficient to make a case for the jury as to whether the death of Harry S. Martin was caused by accident, within the provisions of the policies sued upon. The same provision in regard to double indemnity was contained in each of said policies and is as follows:

"Upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and that such death occurred within sixty days after sustaining such injury and before the expiration of the policy year nearest the sixtieth anniversary of his birth, the Bankers Life Company agrees to pay double the amount called for in the first paragraph, Page 1 of this Policy."

The facts of the case are substantially as follows: The insured, Harry S. Martin, was a man 53 years of age, was what might be called short and heavy-set, and weighed between 160 and 185 pounds. On April 28, 1930, Mr. Martin went to his farm and stayed there until about midnight assisting his employee in taking care of a sow that was farrowing in an individual hoghouse close to a corncrib and other hoghouses. Every time a pig was born Mr. Martin would go into the hoghouse and get it and bring it outside. After Mr. Martin had come out of the hoghouse on one of these trips, Mr. Hunt, his employee, noticed that the back of his hand above the second and third knuckles had been skinned and was bleeding. Mr. Martin wiped the hand with his handkerchief, but continued with his work until about midnight, when he returned to his home. On the following morning, April 29, 1930, between half past 7 and 8 o'clock, Mr. Martin went to one of the Maytag farms to help start a new corn planter. Prior to leaving his home his wife noticed the injured hand and testified that at that time it was puffed and red; that the place where the wound or scab was wasn't more than half an inch, but that the puffing and swelling around the edge of the wound was about the size of a dollar, and was of a purplish or dark purple color which was all around the scab. When Mr. Martin reached the Maytag farm, he helped fix up a corn planter in the barnyard.

While thus working, a wrench which he was using slipped and knocked off the scab on the back of his hand which had been injured the night before. He continued his work on the planter until it was taken into the field and started. Upon leaving the Maytag farm and before returning to his home for lunch, Mr. Martin stopped at the office of Dr. Besser for the purpose of having his injured hand dressed. Dr. Besser testified that at that time the wound had a peculiar discoloration around the edge; that he cleaned it with green soap, put on an iodine dressing, some gauze, and a bandage, and instructed Mr. Martin to return the next day; that when he returned the next day the wound looked a trifle more angry, and he instructed Mr. Martin to come again that afternoon; that Mr. Martin called again in the afternoon and he again dressed it using about the same applications; that the following day the wound looked some better, and the day following that it was cleared up considerably and the swelling had disappeared; that he kept the hand bandaged for several days and that the dressing he used was the regular and approved dressing for that kind of wound; that the last time he dressed the hand was on May 3d or 4th; and that after that he did not examine it.

The evidence shows that prior to this injury Mr. Martin had been a man of great energy, very quick in his movements, and always on the go; that during 26 years of his married life he had never had a doctor except once, about five years before the time of the injury, when he had an attack of flu. After this injury to the back of his hand, the evidence is that a change developed in Mr. Martin's appearance; that he was observed to slow down; that his color was pasty and ashy; that he had a sleepy look and his eyes appeared sunken; that he moved sluggishly as though it was an effort for him to move, and complained of being tired; that on Decoration Day following the accident to his hand he ran a lawn mower across his lawn a couple of times and then went into the house, where his wife observed that he was broken out with perspiration, and said, "I am getting so soft I cannot stand anything", and lay down; that on June 5th following, he complained of feeling very tired; that on June 6th he got up, ate a little breakfast, and started to take off his boots and said: "I am going to bed, I don't feel very good". That he went to one of the Maytag farms and came back home during the forenoon and, when asked what was the matter, said, "I don't feel very good, I came back while I thought I could get back", and then

went to bed. That he complained of pain in his abdomen and remained in bed until about 10, when he got up and said he was going to Mr. Hunt's; that his wife coaxed him not to go and that he then said he would go just a little ways down the street; that he then went to see Dr. Besser. On reaching Dr. Besser's office, he complained of pain in his stomach. Dr. Besser took his temperature, gave him some medicine, and told him to go home, not to eat any dinner, and to let him know if he did not feel better in the afternoon. Upon returning home, Mr. Martin went to bed and remained there until about 4 o'clock in the afternoon. He then got up and rode with Mr. Maytag in an automobile to one of the Maytag farms, Mr. Maytag doing the driving. Upon returning from the Maytag farm, he said he was starved and his wife gave him a lunch and he went to bed about 9 o'clock. On the following morning, June 7th, he got up between 6 and 7 o'clock, but, instead of going to any of the farms, he sat around with his head in his hands and said, "I am going to bed", and told his wife to call the doctor. Mrs. Martin called Dr. Besser and he immediately went to the Martin home. Upon reaching there, he testified that he found Mr. Martin suffering considerable pain through the abdomen. The doctor told him to go to bed and directed that an ice bag be placed upon him, and told Mrs. Martin to report in a couple of hours if he wasn't any easier. In about three-quarters of an hour the doctor was called back and again found Mr. Martin nauseated, and suffering considerable pain, which appeared to be to the right of the center. The doctor made a tentative diagnosis of acute appendicitis and advised him to go to the hospital. Preparatory to taking him to the hospital, his wife, in bathing his back, noticed eight or ten little spots of a purplish color, like his hand had been at the time it was hurt. Mr. Martin was taken to the hospital and a blood count made immediately upon his arrival there. The blood count showed a white count of 14,000 instead of the ordinary normal count of about 7,000. Dr. Besser then had Dr. Johnson, who was in the hospital, look at Mr. Martin, and it was the opinion of both doctors that he was suffering from acute appendicitis. Preparations were immediately made and Mr. Martin was operated on about 9 o'clock in the morning of June 7th. The operation was performed by Dr. Johnson, assisted by Dr. McMurray, and Dr. Besser gave the anæsthetic.

When the abdomen was opened and the appendix disclosed, both Dr. Besser and Dr. Johnson testified that it was not in the condition

they expected to find; that it was somewhat inflamed but was not badly distended; and that the condition in which it was found perplexed them, because it was not such as they considered sufficient to account for the symptoms upon which they had made their diagnosis. The appendix was removed and the post-operative work performed by Dr. Johnson, assisted by Dr. McMurray. According to the testimony of the doctors, Mr. Martin did not improve as expected after his operation. He was nauseated and had considerable pain. This condition continued until the night of June 10th following the operation, when Mr. Martin became decidedly worse. Dr. Johnson was in the hospital during the night attending to another case, noticed the condition of Mr. Martin, and called Dr. Besser. Dr. Besser went to the hospital very early in the morning of June 11, and met Dr. Johnson there. The doctors found that the patient had not been passing any gas and concluded that he had an obstruction of the bowel, what the doctors call paralytic ileus or twisted intestine. Dr. Besser tried to get Dr. Fay or Dr. Harnagel, of Des Moines, to come down to assist in a second operation; but neither of them was able to come. Thereupon, about 5 o'clock in the morning of June 11th, a second operation was performed by Dr. Johnson, assisted by Dr. Besser and Dr. McMurray. In performing this second operation the incision made at the first operation was reopened. In his testimony in regard to this second operation, Dr. Besser stated:

"As he (Dr. Johnson) removed the stitches the wound just gapped open. That exposed to view a dark colored muscle, the fatty tissue and instead of being normal was yellowish in color. Dr. Johnson immediately turned to me, I was at the head of the table, and shook his head. That meant that he had a serious case. Then he took out the stitches and went into the abdomen in search of an obstruction. No obstruction was found. He instead pulled the caecum to view and the intestines generally were black. The intestine near or at the point of the operation was the best part of the intestinal canal. That part of the intestine looked a little better than the other part. There was no twisted intestine. The wound was closed with some drainage tubes. It was then we really made our diagnosis of Welch bacillus infection. We wanted some Welch bacillus serum, that was a hurry order sent from Des Moines."

Dr. Johnson testified in regard to the second operation as follows:

"Before we reopened the incision, as far as the external looks were concerned the wound looked like normal, nearly normal. When we took out the stitches the wound fell open and the cut presented itself black, particularly the muscles. That is what we usually refer to as dry gangrene, or dry bloodless wound, dark color, sloughing with the ileus a dark red, some yellow, considerable fluid in the abdomen and dark patches in the intestinal tract, the muscles sort of crepitus. The suspected bands causing the obstruction were not found. The intestines were generally enlarged and inflated and filled with gas contents. There was fecal matter in the bowels, but not enough to be necessary to tap the bowels. I didn't withdraw any fecal material, the bowels had been pretty well emptied with enemas. The odor was somewhat characteristic, from sour to rancid odor. It wasn't a normal odor, a colon bacillus odor. It was distinctive but it was that peculiar thing that struck me. The muscles were sloughing, had crepitus in them when you pressed upon them and areas of red and yellow. By crepitus we refer to the sound of the scratch of a rusty kettle with metal. Gas in muscle fiber causes crepitus. That gas is not normally present in the muscles."

Following this second operation the wound was closed the second time, and Mr. Martin was given an injection of Welch bacillus serum. For a few hours he appeared to improve, but during the night of June 11th he became decidedly worse, and died about 9:15 o'clock in the morning of June 12, 1930.

In this case we have a direct conflict between two sets of expert witnesses. Dr. Johnson, Dr. Besser, Dr. McMurray, and Dr. Young testified for plaintiff-appellant, while Dr. Harnagel, Dr. Price, Dr. Smith, and Dr. Wyngart testified for defendant-appellee. All the doctors seem to agree that gas bacillus, or, as it is sometimes called, "Welch bacillus" or "barnyard bacillus", comes from animals and contaminates the soil around which animals live; that, as the name, barnyard bacillus, indicates, it is frequently found around barnyards or places frequented by animals. All of the doctors for the plaintiff-appellant testified that in their opinion this gas bacillus might enter at a point of injury on the body and remain dormant in the blood for several weeks or longer and then set up an active infection in some other portion of the body away from the point of injury or entry. This was denied by all the doctors who testified for the defendant-appellee, who gave it as their positive opinion that gas bacillus could not be carried in the blood stream, and that any in-

fection caused by this bacillus must necessarily be located in proximity to the original point of entry and must necessarily develop within a few days after the bacillus had entered the body at the point of injury.

Obviously, it is not the function of the court to pass upon the correctness of the theory of either of these two sets of expert witnesses. The function of the court is to decide whether the evidence is sufficient to make a case for the jury. In doing this it becomes necessary to refer briefly to the evidence.

Dr. Besser, who had been acquainted with Mr. Martin for years, and who was the family physician and gave the anæsthetic at the first operation, testified as follows:

"I based my diagnosis at first from the usual signs of appendicitis, sickness of the stomach, sub-normal temperature, pain in the abdomen with more tenderness on the right side than on the left, which was true in his case and a rapid and rising blood count. Those are three prominent symptoms we find in acute appendicitis. We feel when we have those three symptoms, sub-normal temperature, gripping pains in the right region and nausea. It is my opinion now that he did not have acute appendicitis. In my opinion the probable cause of the death of Harry Martin was gas bacillus infection. In my opinion the probable source of the gas bacillus infection that caused the death of Harry Martin was the wound on his hand three or four weeks before his death. That infection could get from the wound on his hand to the other parts of his body in the blood stream. Germs may be in the bloodstream for three months without producing any ill effects. Frequently it shows up at the point of inoculation. In my opinion I do not think there was any other pathological or diseased condition in this man's body that caused his death other than gas bacillus infection. In my opinion this wound on the hand was infected at the time I observed it about the 29th day of April, 1930."

In connection with the examination of Dr. Johnson, who performed both operations, the record shows the following:

"Q. Now Doctor, assuming that Harry Martin was about 53 years of age and had always, practically always been a farmer by occupation, and was in apparently good health until the 28th day of April, 1930. But about April 28th and 29th, 1930, he received a bruise on the back of his hand by striking it against an object in a

yard or house where a sow was farrowing that he was caring for, and that the hand bled at the time, and the skin was removed or broken. And that on the following morning after the wound or break in the skin on his hand had scabbed over that he again struck the hand at the same place and that it bled again, this time the striking being against a corn planter or wrench in the yard near the house and barn on the farm. That about May 1, 1930, or April 29, the hand was dressed, perhaps on the same day as the second striking of the hand, the hand was dressed by his family physician, who found an abrasion of the skin. That his family physician again dressed the hand on several occasions within the following few days, the physician found that the wound was infected and required daily attention for a few days, the skin was discolored around the outside of the wound with a dark discoloration. That the physician used green soap to cleanse the hand and used iodine dressing in treating the hand at those times and placed a bandage upon the hand, which was removed and other dressings replaced during those same days. That the hand apparently healed about the fore part of May and that the first part of June, 1930, he looked sick, his skin was of an ashy color and on one occasion he was sleepy or drowsy in the day time, and on one occasion was noted to perspire very freely and apparently tired easily. That on about June 6th or 7th, 1930, it was found he had acute abdominal pains, that he was taken to the hospital and then you were called there and saw him and observed the condition and facts with reference to him to which you have testified here; assuming these facts, what in your opinion was the probable nature of the infection which Harry Martin had there and shortly to the time of his death?"

Defendant objects as incompetent, irrelevant and immaterial, including facts not in evidence in this case, exclusively shows they are not in evidence in this case, calling for opinion and conclusion of the witness, based upon an observation rather than upon the matters testified to in the case and therefore incompetent. Objection overruled. Defendant excepts.

"A. He got a gas bacillus infection.

"Q. Assuming these facts which I have stated in the last previous question to be true, what in your opinion was the probable source of that infection in his system?"

Same objection as last made and for the further objection

usurped the province of the jury; for testimony upon the witness stand is determined by the jury. Objection overruled. Defendant excepts.

"A. The abrasion on the back of his hand.

"Q. And assuming these facts to be true which I have stated to you in the last two preceding questions, what in your opinion was the probable cause of death of Mr. Martin?"

Same objection as last made. Same record. Defendant excepts.

"A. The toxemia of the gas infection.

"Q. Assuming these facts to be true as stated in the last preceding questions, state whether or not in your opinion there was any other cause probably contributing to the death of Harry Martin aside from the gas bacillus infection to which you referred?"

Same objection. Same record. Defendant excepts.

"A. There are no other causes.

"Q. Assuming these facts to be true which I have stated in the last four preceding questions, state whether or not in your opinion the operations that were performed probably hastened or contributed to Harry Martin's death?"

Same objection. Same record. Defendant excepts.

"A. They did not hasten his death."

The following hypothetical question in substance was proposed to both Dr. McMurray and Dr. Young. The record in connection with this hypothetical question as proposed to Dr. Young is as follows:

"Q. Assuming, Dr., that a man about 53 years of age was always a farmer by occupation, as prior to April 28, 1930, apparently in good health, and active in his work, that about April 28 or 29, 1930, he received a bruise on the back of his hand which broke the skin and caused bleeding. That at the same time he was a farm manager and the bruise was received from striking against a hog shed and corn planter or wrench in fixing the corn planter. That at the time of the injury and immediately thereafter he was working with sows who were farrowing and with the cornplanter machine, working with the sows after the hand had been struck on the

hog shed and with the cornplanter machine after the hand had been struck against the cornplanter machine or wrench; that the second bruise on the cornplanter machine was on the next day after the first injury, or at least several hours later, and the first wound where it had been bleeding had scabbed over and that the wound again bled after the second bruise; that about May 1, 1930, or about April 29, 1930 the hand was dressed by his family physician, who found an abrasion of the skin; that his family physician again dressed the hand on several occasions within the following few days and the physician found the wound was infected and required daily attention for some days; that the skin was discolored around the outside of the wound with dark discoloration; that the physician used an iodine dressing in treating the hand; that the wound apparently healed prior to June 7, 1930; that about the first part of June, 1930, he looked sick and his skin was of an ashen color, and on another occasion he was drowsy in the day time and on one occasion perspired very freely and tired easily; that on or about June 6 or 7, 1930, it was found he had acute abdominal pain; that an operation was then performed and the appendix removed; that just prior to the time of the operation the count of the leucocytes of the blood was about 14,000; that the patient had much nausea and that the wound made by the operation in the abdominal wall did not heal; that a second operation was performed where the first operation had been performed; that at the place of the second operation the rectus muscle was almost bloodless, the tissues of the abdominal wall and muscles were infected; that gas bubbles and crepitus were present; that the tissues of said wall were sloughing and were a dark red color and the fatty part was yellowish, and had a sweetish odor, his bowels were partly discolored and filled with gas and there was little fecal matter; that thereafter the infection grew more extreme and more intense until his death in the afternoon of June 13, 1930; that there were observed certain purplish spots in some places on his back just before the first operation; that there was no other abrasion of the skin or membranes except on the hand; that the appendix adhered to the abdominal wall but was only slightly inflamed; that after death the exterior of his body became darkly discolored within a short time; that he was conscious practically all of the time until right at the end of his life; that the abdominal pains did not leave after either operation entirely; that the stump of the appendix at the time of the second operation was apparently

healing—What in your opinion, Dr., was the probable nature of his infection?"

. Defendant objects as incompetent, irrelevant and immaterial, assuming facts not established in the evidence and omitting material facts that have been proven in the case by the evidence, containing indefinite statements of the record and not definite statements of the facts as shown by the records, and not containing such statement of facts as they appear in the records and not forming a basis of opinion by an expert witness, it is an improper hypothetical question, invading the province of the jury, incompetent, irrelevant and immaterial. Objection overruled. Defendant excepts.

"A. Probably gas bacillus infection.

"Q. And assuming these facts to be true as I stated in the last preceding question, what in your opinion was the probable source of that infection?"

Same objection. Same record. Defendant excepts.

"A. The source of entrance?

"Q. The source of entrance of the infection?"

Same objection. Same record. Defendant excepts.

"A. Probably through the original abrasion on his hand.

"Q. And assuming these facts to be true that I have assumed in the last two preceding questions, what in your opinion was the probable cause of the death of the man referred to?"

Same objection. Same record. Defendant excepts.

"A. Well you mean the immediate cause of his death?

"Q. Yes, the cause of his death? A. Septicemia.

"Q. What was that septicemia in your . opinion probably caused by?"

Same objection. Same record. Defendant excepts.

"A. Probably gas bacillus."

The record in regard to such hypothetical question as proposed to Dr. McMurray is as follows:

The same objection was made to this question that was made to the question when propounded to Dr. Young. The objection was overruled, and the question answered as follows:

"A. Basing the answer upon the findings admitted in this hypothetical question and upon my personal observation of this case my diagnosis of this particular infection which caused Mr. Martin's death was an infection due to a form of Welch bacillus or gas bacillus."

Defendant moves to strike the answer of the witness as incompetent, irrelevant and immaterial, a question based upon the hypothetical question and would be incompetent, irrelevant and immaterial. Motion overruled. Defendant excepts.

"The observation I refer to in my answer is that which I have testified to here.

"Q. Basing your opinion upon the facts stated in the two preceding questions and upon your observations of Mr. Martin as testified to by you, what in your opinion was the probable source of that infection or port of entry into his system?"

Same objection as to the hypothetical question. Same record. Defendant excepts.

"A. The port of entry of this infection was undoubtedly the abrasion and contusion of the muscles on the back of his hand.

"Q. Basing your opinion upon the facts assumed in the hypothetical question and upon the facts which you observed and to which you have testified, what in your opinion was the probable cause of the death of Harry Martin?"

Same objection as that urged to the previous question just propounded. Same record. Defendant excepts.

"A. The cause of his death was the infection by the gas bacillus."

Plaintiff-appellant contends that this testimony of the doctors, together with the facts previously set out and which are shown by the record, makes a question for the jury. Defendant-appellee contends that the evidence is not sufficient to make a case for the jury. Defendant-appellee points out several reasons in support of its contention. These reasons may be summarized as follows: First, the evidence fails to show that the death of the insured was caused by gas infection; second, the evidence fails to show that the death of the insured could have been caused by a gas infection resulting from the injury sustained to his hand on the 28th day of April,

1930; third, the evidence fails to show that the injury to the insured's hand was an accidental injury; fourth, the evidence affirmatively shows that the operations performed on the insured contributed to his death. We shall treat these contentions of the appellee in the order in which they are above presented.

I. As the appellant is claiming because of death caused by accident, and bases such claim upon an infection resulting from the injury to his hand sustained by the insured, it is necessary that the evidence show that the death of the insured did result from a gas bacillus infection. In support of its contention that the evidence fails to show that death resulted from gas bacillus infection, appellee places great stress upon the evidence of the four doctors who testified in behalf of appellee, and who all gave it as their opinion that the death of the insured did not result from gas bacillus infection, but resulted from a general peritonitis following the operation for appendicitis. On the other hand, the four doctors who testified for appellant deny that the conditions existing as shown at the time of the second operation indicated a general peritonitis. They testify that the color and condition of the muscles, of the fatty layer of the abdomen, of the bowels and peritoneum, the odor detected when the wound was reopened, and the crepitus disclosed in the muscular tissue, all indicated a gas bacillus infection. The doctors who testified for the appellee also suggested other theories by which the infection which they claimed caused the insured's death was explainable as a result of the first operation. They pointed out that such infection might result from a failure to properly sterilize the body of the patient, the instruments, towels, catgut sutures, and other appliances used; from a hole or break in the rubber gloves, from a failure to thoroughly sterilize the stump of the appendix, and other causes. Appellant's doctors and the nurse in charge of the sterilization in the operating room, on the other hand, testified that all instruments, towels, and other appliances, were properly sterilized; that the stump of the appendix was thoroughly sterilized; that the approved and recognized methods were followed in performing the operation; and that the possibility of the infection resulting from anything connected with the first operation was exceedingly remote. There seems to be no question that the color of the muscular tissue, the odors detected, and the crepitus in the muscular tissue are peculiarly indicative of a gas bacillus infection. Notwithstanding the contention of the experts for the appellee,

who claim that no certain diagnosis of bacillus can be made except by a laboratory test, the experts for the appellant contend that the evidence discovered by them is amply sufficient to prove such infection. As the evidence of the appellant must be considered in its most favorable light, it cannot be discarded simply because of appellee's evidence to the contrary. We are, therefore, of the opinion that there is sufficient evidence in the record that the death of the insured did result from gas bacillus infection to make this a question for the jury.

II. Appellee contends very strenuously that, even if the death of the insured did result from a gas bacillus infection, the evidence is wholly insufficient to show that such infection was in any way the result of the injury sustained to his hand by the insured on the 28th or 29th day of April, 1930. Here, the appellee again argues that the evidence of the experts who testified in its favor clearly shows that any infection arising from the gas bacillus infection must necessarily develop at or in proximity to the injury which is the point of entry; that it is impossible for such bacillus to be carried in the blood stream and to set up an active infection at a point in the body distant from the point of entry; and that infection caused by the gas bacillus always appears within a very short time after the entry of the bacillus at the point of injury and develops very rapidly. Here again, however, the testimony of the doctors for appellant is in direct conflict with the testimony of the doctors who were witnesses for appellee. It is not the function of the court to decide as to the qualifications of the respective witnesses or the weight to be given to their testimony. That is the function of the jury. If the testimony given by the witnesses for the appellant may be considered at all, the court is not allowed to declare it insufficient simply because it may appear to the court that evidence in conflict therewith is of greater weight.

Appellee further contends, however, that the evidence of the doctors who testified for appellant cannot be of any weight whatever in determining whether the infection which caused the death of the insured resulted from the injury received to his hand, because, in forming their opinions and reaching their conclusions, such witnesses necessarily based inferences upon inferences, instead of basing inferences upon facts which were proved by direct evidence. In support of this contention the appellee quotes from 22 C. J. 84, and cites the cases of Ellis v. Ellis, 58 Iowa 720, 13 N. W.

65, and Thayer v. Smoky Hollow Coal Company, 121 Iowa 121, 96 N. W. 718.

An examination of the authorities cited shows that they have reference to presumptions and not to inferences, except in so far as a presumption may be said to be an inference. It is quite true that the language of some text-writers and of some judicial decisions may contain statements to the effect that an inference cannot be based upon an inference. The later and better authorities, however, now hold quite generally that the reasons given as a basis for such a rule are not sufficient, and that such rule was never generally accepted and is without basis of sound authority. In the case of Welsch v. Charles Frusch L. & P. Co., 197 Iowa 1012, 193 N. W. 427, 431, the so-called rule against basing an inference on an inference was considered, and we said:

"Possibly, however, it is as pertinent here as anywhere to refer to appellee's frequent appeal to the so-called rule which forbids 'building inference upon inference.' The phrase so quoted is one of the many sayings having a legitimate use in some phases of legal discussion, but not rising to the dignity of a universal rule of evidence and often mistakenly applied or cited in support of an effort to exclude or neutralize competent circumstantial evidence. In proving or disproving any alleged fact by circumstantial evidence, inference is often legitimately drawn from facts established by other inferences. Indeed, if we exclude all inferences which depend in any degree upon other inferences from established or admitted fact, very little human testimony would ever reach the ear of court or jury. Says Mr. Wigmore:

" 'It was once suggested that an "inference upon an inference" will not be permitted,—i. e., that a fact desired to be used circumstantially must itself be established by testimonial evidence; and this suggestion has been repeated by a few courts, and sometimes actually enforced. There is no such rule; nor can there be. * * * All departments of reasoning, all scientific work, every day's life, and every day's trials proceed upon such data. The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon.' 1 Wigmore, Evidence, section 41."

See Hiatt v. Travelers Ins. Co., 197 Iowa 153, 197 N. W. 3,

33 A. L. R. 655; Business Men's Accident Ass'n v. Schiefelbusch, 262 F. 354, 356, 357 (C. C. A. 8th Cir.); Preferred Accident Insurance Company of New York v. Barker, 93 F. 158, 160, 35 C. C. A. 250 (5th Cir.); Baciocco v. Prudential Ins. Co. (D. C.) 22 F. (2d) 700, 702; Killingsworth v. Aetna Life Ins. Co. (D. C.) 49 F. (2d) 399.

▆▆▆ Appellee also contends that there is no direct evidence to support the theory of accidental cause producing the death of the insured, and that no verdict could stand because it would have to be based upon mere theory or supposition. We are unable to see the force of this argument. The four doctors who testified in behalf of the appellant were all shown by the evidence to be graduates of recognized medical schools and licensed members of the medical profession in this state. So far as the record shows, no question was or could be raised in regard to their qualifications to testify as experts. Three of these doctors were present at the final operation on the insured, and testified that the conditions then existing in and about the wound where the operation had been performed were such as to indicate unmistakably the presence of a gas bacillus infection. All three of these doctors and the nurse were present at the first operation and described it in detail. They eliminated the probability of any infection resulting from anything that was done in connection with that operation. The testimony of the wife of insured, of Dr. Besser, the family physician, and of the man employed on the insured's farm, eliminated any injury, other than that to the back of his hand on April 28 or 29, 1930, through which the gas bacillus might have gained entrance to the body of the insured. The four medical witnesses for the appellant testified to the possibility of the gas bacillus entering the blood stream and remaining there for weeks before setting up an infection in some part of the body removed from the place of injury and original point of entrance. Mrs. Martin and Dr. Besser testified as to the condition and appearance of the injured hand following the injury on April 28th or 29th. Dr. Besser testified that the appearance of the hand at that time was such as would be caused by the presence of gas bacillus in the wound. All the doctors testifying for appellant gave it as their opinion that the gas bacillus entered through the wound on the back of the hand at the time it was injured, and that, from this point, it entered the blood stream and later set up an infection in the insured's abdomen which was

the final cause of his death. Whether these witnesses may have been mistaken is not a question for the court to decide. They, as experts, have given their opinion, based upon evidence which appears in the record. Whether the evidence as to the facts upon which these opinions are based is true, and how much weight should be given to the opinions themselves, are matters within the discretion of the jury. We do not see how, under the facts of this case, the court can say, as a matter of law, that there is not sufficient evidence in support of appellant's contention to make it a question for a jury to determine whether death of the insured was caused by a gas bacillus infection which resulted from the injury to his hand.

■ III. Appellee argues that there is no evidence that the injury to the hand of the insured was accidental. The evidence of the witness Hunt, who was the employee of the insured, and who was assisting him at the time he was injured on the night of April 28, 1930, shows that the witness saw the blood on the insured's hand and spoke to him about it, and that the insured said that he had skinned his hand going in or coming out of the hoghouse. Appellee devotes considerable argument to the contention that, before the wound to the insured's hand can be said to have been caused by an accident, it must be shown that not only the result, that is, the wound itself, but also the means which brought about this result were accidental; and contends further that there is no showing that the motion or movement of the hand which resulted in the scraping of the skin off the back thereof may not have been a voluntary motion or movement of the insured. Appellee even suggests the possibility that the insured may have been attempting to scrape some fecal matter off of the back of his hand and in doing so scraped off the skin, and argues that this would not have been an accident within the meaning of the provision of the policy. It is true, there is authority to the effect that, in order to constitute an accident within the meaning of the terms of a policy similar to the one in question, not only the result but the means also must be accidental. To argue from this rule that there can be no recovery, because it is not shown by the evidence that the insured did not injure his hand as the result of an intentional voluntary motion, does not seem to be a very logical process. Here we have evidence that the injury to the back of insured's hand was caused in going in or coming out of the hoghouse. In addition to this evidence, there is the presumption that the wound was not intentionally inflicted, and from this

the inference can be drawn that it was caused by accidental means. In Caldwell v. Iowa State Traveling Men's Association, 156 Iowa 327, 136 N. W. 678, 679, we said:

"It has been repeatedly held that, in the absence of direct evidence on the subject, a presumption arises that the wound was not intentionally inflicted either by the assured or by another. This presumption is almost the equivalent of a presumption that the wound was inflicted through accidental means. The authorities, however, stop short of announcing the presumption in this latter form. They do hold, however, that the presumption first stated is available to the plaintiff as affirmative evidence; and that an inference may be drawn therefrom by the triers of fact that the wound was caused by accidental means as the only other alternative." (Cases cited.)

▪▪ IV. Did the operations performed upon the insured contribute to his death? The provision of the policy involved herein applies only if "the death of said insured resulted directly and *independently of all other causes* from bodily injuries effected solely through external, violent and accidental cause." Appellee contends that the evidence shows that the gas bacillus could not live in the blood stream for four or five weeks and that, therefore, the infection which caused the death of insured could not have come from the scratches on the hand. In asking us to accept this position, the appellee is again asking the court to disregard all the evidence of the appellant's experts and to accept the evidence of the experts for the appellee. This, we cannot do. Appellee contends further that the appendicitis and the operation for appendicitis which took place in this case introduced a new and independent cause which contributed to the death of the insured, and that, even if the death did result from gas bacillus infection, the operation contributed to and hastened the death. Appellee quotes in argument a statement made by Dr. Johnson, one of appellant's witnesses, and alleges that, while Dr. Johnson testified that the operation did not hasten the death, he would not go so far as to testify that it did not contribute to the death of insured. Even if Dr. Johnson had admitted that the operation had hastened or contributed to the death of the insured, this would not necessarily present a case where the court would be justified in directing a verdict for the defendant, because, as said in Stearns v. Railway Company, 166 Iowa 566, 148 N. W. 128, 133:

"It is equally well settled that one is not concluded by what a witness in his behalf testifies. Notwithstanding he may prove the truth, although such proof inferentially discredits his own witnesses."

But Dr. Johnson did not even inferentially admit that the condition of the appendix or the operation to remove it hastened or contributed in any way to the death of the insured. On the contrary, the following appears in his testimony:

"Q. Assuming these facts to be true as stated in the last preceding question, state whether or not in your opinion there was any other cause probably contributing to the death of Harry Martin aside from the gas bacillus infection to which you referred?

"A. There are no other causes."

In addition to this testimony of Dr. Johnson, Dr. Besser testified as follows:

"In my opinion, the operations which were performed on Harry Martin at the hospital did not hasten or contribute to his death."

On the whole case, it appears to us that the evidence adduced by the plaintiff was sufficient to make a case for the jury, and that in directing a verdict in favor of the defendant, the trial court erred.

The ruling and judgment of the trial court is reversed.

ALBERT, C. J., and EVANS, KINDIG, CLAUSSEN, MITCHELL, and ANDERSON, JJ., concur.