MARY BAUER, Appellee, v. HARRY REAVELL, Appellant.

No. 42836.

APRIL 3, 1935.

Kenline, Roedell, Hoffmann & Tierney, for appellant.

John J. Kintzinger and Al J. Nelson, for appellee.

HAMILTON, J.—North Grandview avenue in the city of Dubuque, Iowa, is a wide boulevard with parking in the center, running north and south. The extreme north end of this boulevard spreads out into a wide intersection, branching out westerly into two streets, Grace street running due west, and Delhi street running in a northwesterly direction. The territory between Delhi and Grace streets is thus wedgeshaped, with the point or apex of the wedge pointing eastward into this broad intersection. Another branch from this broad intersection goes eastward, which is a continuation of Delhi street. At the point or apex of this territory between Grace and Delhi streets is an oil station, and around the oil pumps or tanks and from one street to the other, entirely around this apex, is a covering of cement of apparently the same material and elevation as the sidewalk. At the north is an approach to the oil station from Delhi street, leading from the brick pavement up onto the cement surrounding the oil pumps or oil station. This approach is 41 feet in length and slopes up from the street to the sidewalk level and this slope is about 3 feet in width. Delhi street is 36 feet wide and is paved with brick. A street car track runs down the center of the street. There is a cement curb on each side of the street. This curb, at or near the point where it intersects the approach to the oil station, is 7½ inches high from the surface of the pavement, and 6 inches in width. Coming from the west, this curb ends at the west side of this 41-foot approach to the oil station, and turns in to form the curb to the driveway or approach leading up to the oil station. Between this curb and the cement sidewalk is a terrace of earth a few feet in width. There is a light or telephone pole in this terrace, located three feet west from the west side of this approach, and two feet in or south from the face of the curbstone. Just west of this pole, about three feet, is a "slow" sign, supported by an angle iron about eight feet high. The "slow" sign is fastened to the top of the angle iron. This angle iron is about one foot south from the face of the curb.

On the night of November 20, 1932, at about 9:45 o'clock p. m., the plaintiff, a lady sixty-one years of age, was waiting for a bus. She says she was standing on the curbstone, directly north of this telephone pole, and while standing there, something suddenly "lifted her up" and the next thing she knew she was lying on the pavement and a man was standing over her saying: "If only somebody would come and help me pick you up off this cold cement." "That this

had to happen to me." No horn or signal of any kind was sounded before she was hit.

Defendant was proceeding east along Delhi street, driving his Model A Ford car. His wife and her father and two small children were in the back seat. The defendant was alone in the front seat, operating the car. It was Sunday evening and they were going to visit friends who lived south on Grandview avenue. He says he had been driving about 15 miles an hour and as he approached the corner to make the turn to go south on Grandview avenue he slowed down to 10 or 12 miles an hour. He suddenly saw a person, about three feet in front of his car, coming towards him.

It is established by the evidence without dispute from admissions of the defendant that his car in some way came in contact with the plaintiff and knocked her down upon the pavement. He gives it as his judgment that it was the right corner of his front bumper that struck her. That she was severely injured is amply shown by the evidence. She was taken to a hospital and examined by a physician, X-ray pictures were taken, and the doctor testified that the large bone of the leg, called the tibia, was fractured in several places, extending into the knee joint. The small bone, or fibula, was fractured on or about the same level. Her face and scalp were greatly swollen and discolored. There was a bad bruise or contusion on the left side of her head, above the ear; the scalp was raised, probably half an inch, and there was a hemorrhage underneath the scalp over an area larger than the palm of the hand. One of her ribs was fractured. There were two fractures in the pelvic region, one of the pubic bone, and the other of the ascending ramus. The evidence showed that she suffered intense pain for weeks and sustained permanent injuries, and the verdict, while large, is not excessive under the evidence and the conditions disclosed.

One hundred and eight separate and distinct errors are assigned, covering over fifty pages of printed matter, and deal with practically everything pertaining to the trial—the examination of the jurors on their voir dire, the pleadings, the rulings of the court on the admission or rejection of testimony, the refusal of the court to direct a verdict at the close of the evidence of the plaintiff and at the close of all the evidence, the giving of the instructions, the arguments of counsel, and the conduct of the jury in its deliberations. Counsel for appellant certainly were diligent in making objections and pointing out alleged errors. To analyze and separately discuss

each and all of these various assignments of error within the proper compass of this opinion would be entirely out of the question. We have carefully read the entire record and examined the authorities and for the most part the complaints made by the appellant are not well founded.

 His first proposition relates to misconduct with reference to the examination of the jurors on their voir dire, and also to the admission of testimony bearing on the question of liability insurance. Each juror was asked by the attorney for plaintiff this question: "Are you a stockholder, officer or director in any insurance company writing liability insurance?" This court held in Raines v. Wilson, 213 Iowa 1251, at page 1262, 239 N. W. 36, that a similar question was proper to be asked for the purpose of informing counsel relative to his right in exercising peremptory challenges, there being nothing in the record to show want of good faith on the part of plaintiff's counsel, nothing to show a wilful, diligent, or persistent course or effort to impress upon the jury the fact that defendant's liability was insured, and that there was no abuse of the court's discretion in permitting this question to be asked. See, also, Olson v. Tyner, 219 Iowa 251, 257 N. W. 538.

The insurance matter was again mentioned by the plaintiff's witnesses in relating the conversation with the defendant shortly after the accident occurred, and we think comes within the rule in the case of Stilson v. Ellis, 208 Iowa 1157, 225 N. W. 346, where the object and purpose was to introduce evidence of admissions against interest, and the information concerning insurance carried by the defendant was elicited as a part of the conversation containing the admissions, and under such circumstances complaint cannot be made, because a part thereof referred to the liability insurance. The conversation took place at the hospital soon after the accident. There were present two policemen, the daughter, and the son-in-law of the plaintiff. Policeman Gilligan related the conversation with the defendant as to how the accident occurred and in the course of this testimony he said:

"He (referring to the defendant) said that he was driving east and he didn't see this lady until he had hit her; he struck this lady and knocked her down.

"Q. Did he say anything at that time as to what part of the car he had hit her with? A. He said he didn't know; he didn't see the woman until he had struck her and felt the impact against the

car; he got out and the woman was lying in the street. Had further conversation with him at the hospital with reference to this.

"Q. What did Harry Reavell, the defendant, say at that time? A. I asked him if he had insurance and he said he did and he would take care of this lady and see that she was taken care of at the hospital and get her a doctor."

As to a part of the same conversation in the hospital, the witness George Oakley, son-in-law of the plaintiff, testified:

"He said he was about three feet or that far in front of her before he noticed her; he said he stopped his car and went around and picked her up so she wouldn't lay on the cold cement; he said he couldn't figure how he hit her.

"Q. Did he say at that time whether everything would be taken care of? A. Yes. He said he was willing to settle and he wanted everything taken care of."

Mrs. Oakley, plaintiff's daughter, then related the same conversation at the hospital, and she testified:

"Mr. Reavell was there; heard him speak of this accident. He said he didn't know how he hit her; that he was about three feet from her, before he seen her.

"Q. Did he say anything there about whether or not he was willing to settle? A. He said everything would be taken care of. He said she was lying on the cement and he picked her up off of the incline.

"Q. And what if anything did he say as to everything being taken care of? A. Yes, he said everything would be taken care of; she should stay in the hospital."

It will be noticed that neither the daughter nor the son-in-law made any reference to insurance, although they had heard the entire conversation. This shows there was no effort on the part of appellee to inject this matter into the case. On cross-examination of Mrs. Oakley, the appellant's attorney persisted in his questioning as follows:

"Q. You have given substantially what Reavell said, that you heard? A. Yes.

"Q. In your testimony here, haven't you? A. Yes.

"Q. Now you say that he said he did not know he hit her, and he was this distance from her, before he hit her, about how many feet? A. About three feet, he said.

"Q. And that is all he said about his seeing her and not seeing her, isn't it? A. What is that?

"Q. That's all he said about his seeing her or not seeing her? A. Yes, that was all he said.

"Q. Yes, and he said that everything would be taken care of? A. Yes.

"Q. That is all he said that night upon that subject, wasn't it? A. Well, he says, 'I have nothing. I have nothing. I will ring the insurance company.'

"Q. And then he said something to you about she was lying on the cement? A. Yes, he did."

We think this testimony was in the nature of an admission and was admissible for that purpose and was elicited in such a way as not to be objectionable. Especially is this true since it was brought out on cross-examination, more forcibly than in any other way. And even though the answer of Policeman Gilligan might be open to criticism, any error committed in permitting the answer to stand would be without prejudice in the light of what was brought out by the appellant on cross-examination.

"A party to a lawsuit has a right to bring forth all relevant, material, and competent facts. Although such material, relevant, and competent facts include the suggestion that one party carries insurance, the rule is not changed. Error arises only when a party intentionally brings before the jury on an immaterial or irrelevant matter the fact that the opposite party carries insurance." Albert v. Maher Bros. Transfer Co., 215 Iowa 197, at page 214, 243 N. W. 561, 569.

"If in truth and in fact the conversation relating to insurance is a part of a material admission made by a party properly thus charged, it may be called for." Ryan v. Simeons, 209 Iowa 1090, 229 N. W. 667, 671.

As stated in Berridge v. Pray, 202 Iowa 663, 210 N. W. 916, 918, "We have expressed ourselves in no uncertain terms on the ultimate question here involved,—the impropriety of suggesting to the jury that the damages sued for were covered by insurance,"

and we are not at this time inclined to change, or in any way modify, the rule laid down by this court in its prior holdings in reference to this subject of injecting extraneous matters into the case for the purpose of attempting to influence the verdict of the jury. Matters of this kind should be carefully guarded against and diligently excluded unless they fall within the exception referred to in the case of Stilson v. Ellis, supra.

■ The appellant raised the same question in support of his motion for a new trial by affidavits of some of the jurors to the effect that the matter of insurance was brought up and discussed in the jury room. Three different jurors made affidavits to this fact, but in none of them was there any statement that the matter influenced their verdict, and eight or nine of the jurors made affidavits denying that any such discussion took place. In view of the fact that the claimed discussion in reference to insurance is controverted by at least eight of the jurors and in the absence of any showing that the misconduct, if any, was such as to materially affect the rights of the complaining party, or that they influenced the result reached by the jury, the defendant is not entitled to a new trial on this ground. See State v. Olds, 106 Iowa 110, 76 N. W. 644; State v. Cross, 95 Iowa 629, 64 N. W. 614.

■ The three grounds of negligence submitted by the court to the jury were: (1) In failing to stop his automobile before striking the plaintiff, causing the injuries complained of; (2) in failing to keep a look-out for persons ahead of him in the street; (3) in driving his automobile at a greater speed than permitted him to bring it to a stop within the assured clear distance ahead.

It is the settled doctrine that negligence is never presumed but must be proven as alleged. This general rule is qualified only by the doctrine of *res ipsa loquitur*, but this doctrine has no application where specific acts of negligence are alleged. Orr v. Des Moines Electric Light Co., 207 Iowa 1149, 1153, 1156, 222 N. W. 560. The plaintiff having alleged in her petition specific acts of negligence, she cannot depart from the issues thus tendered, and a court is warranted in submitting only those grounds which find support in the evidence. Kelly v. Muscatine, B. & S. R. Co., 195 Iowa 17, at page 21, 191 N. W. 525. The court, in passing upon a motion to direct a verdict against the plaintiff, must view the evidence in the light most favorable to the plaintiff. Every inference reasonably permissible in support of the issues should be carried to the aid of the

evidence. Thompson v. Cudahy Packing Co., 171 Iowa 579, 151 N. W. 470; Deiling v. Des Moines Ry. Co., 217 Iowa 687, 251 N. W. 622. It is not enough to prove negligence. The negligence alleged and proven must have causal connection with the injury. Kuhn v. Kjose, 216 Iowa 36, at page 41, 248 N. W. 230. The rule of evidence in establishing the fact of proximate cause is the same as applied to the determination of any other question of fact involved in the case. If different reasonable minds might reasonably reach different conclusions from all the evidence and circumstances, then it is for the jury to determine, and should be submitted to the jury. Buchanan v. Hurd Creamery Co., 215 Iowa 415, at page 426, 246 N. W. 41.

It is the contention of appellant and it was urged at every stage of the trial that the plaintiff has failed to meet the foregoing established principles with reference to her claim for damages based upon negligence, in that, first, there was no negligence proven, and, second, that the proof did not conform to the allegations of negligence, and that there was no proof of negligence on the part of the defendant that was the proximate cause of the injury, and that the plaintiff failed to show herself free from negligence which contributed to the proximate cause of the injury, and that the evidence showed that the injury was the result of an inevitable accident.

It is strenuously contended by the appellant, and the burden of practically all his complaints grows out of this contention, that the allegations of the petition, and the theory of plaintiff's case and all her proof are based upon the claim of the plaintiff that she was struck while standing on the curbstone, while the evidence, as appellant claims, conclusively shows, and the physical facts are such as to make it impossible to believe any other theory than that she was struck while out in the street or on the pavement, and that therefore the proof does not conform either to the allegations of the petition or to the theory of the plaintiff in introducing her testimony. The weakness of appellant's contention in this regard is that he fails to recognize the fact that the evidence is squarely in conflict. Both stories cannot be true. The defendant claims that he was never closer than $3\frac{1}{2}$ feet to the curbstone on which plaintiff contends she was standing when she was struck. The jury was, therefore, faced with an impossible, irreconcilable dispute of facts. They were forced to choose between what they deemed to be the false and the true.

Under this state of the record, if there was evidence to support plaintiff's theory, it was the duty of the lower court to permit the case to go to the jury. The appellant insists that the facts in this case bring it within the exceptions to the rule referred to in the case of McGlade v. City of Waterloo, 178 Iowa 11, at page 14, 156 N. W. 680, 681, wherein the court says, after stating the general rule that when there is a fair dispute in the testimony at the conclusion of plaintiff's testimony and there is enough to take the case to a jury, a defendant cannot, after introducing his evidence, claim that there is nothing for a jury to determine:

"But there are some exceptions to this rule. For example, if the testimony offered by the party having the burden, is in conflict with undisputed facts, and especially with physical facts which are a verity, or is such that under all the circumstances, it cannot, in the nature of things, be true, or is such as that it is entirely and wholly inconsistent with any other theory than that the witnesses must have been mistaken, the trial court is justified in directing, and it is its duty to direct, a verdict for the other party."

The rule is again stated in First Savings Bank v. Edgar, 199 Iowa 1136, at page 1142, 199 N. W. 1011, 1014, that "where the testimony offered by a party upon whom rests the burden of proof is in conflict with undisputed facts, it is the duty of the court to direct a verdict."

We have examined the evidence in the light of this statement of the rule, or rather, the exception to the general rule, and we do not find the facts in this case such as to bring it within the exception. It is true that the defendant and both occupants of the back seat of his car all testify to the speed of the car and to the fact that the car was never closer than 3½ feet from the curb, and that when the plaintiff first came into their view she was out in the street, six feet from the curb, waving her hands and apparently coming in a southwesterly direction toward the car and about three feet in front of the car when they saw her. None of them claims to have seen her leave the curb. None of them appears to know where she came from. Yet all three of them testify that they could see clearly objects such as the telephone pole and the slow sign and even the shadows cast by the objects near the filling station for about 50 feet, and that they were looking straight ahead. In fact, the defendant says that he saw these other objects; that the lights of his car lit up the whole

street and that he could see objects 75 feet down the street and did
see the telephone post and the slow sign post a distance of 50 feet,
but did not see the plaintiff—in fact, he says she was not there to
be seen at the curb where she claims to have been standing. The
jury was warranted from all the circumstances and evidence intro-
duced by the plaintiff in finding that she was there, that she was a
visible object, as much as, or more so than the telephone post or
the slow sign or the shadows cast on the street, and being a visible
object within the range of the vision of the defendant, he was
bound to see her, if he was exercising due care in keeping a look-
out for pedestrians as he passed through this thickly populated
portion of the city. The jury was not confronted with a situation
where there was confusion and excitement attending the happening
of the accident, where different witnesses in their excitement might
get entirely different impressions of what happened. Neither party
claims that there was any confusion or any diverting circumstances.
The evening was dark; the lights on the car were operating; the
defendant's eyesight was good. The plaintiff had taken a bus at
this point many times during the past year. There was no reason
why she should be confused or mistake a Model A Ford for a bus,
and in her confusion run out into the street in an attempt to stop it.

The evidence discloses that when the defendant was first ap-
proached in reference to how the accident happened, he stated that
he did not know how he happened to hit her. Here is the substance
of plaintiff's testimony on this point: The plaintiff was asked:

"Q. I will ask you to state whether or not he said anything
with reference to his car hitting you? A. Well, he were very sorry
and I shouldn't worry, everything would be taken care of.

"Q. Did he say anything to you with reference that his car
hit you? A. Yes.

"Q. What did he say with reference to his car hitting you, if
anything? A. Well, he were sorry he struck me. At the time I were
struck, I were standing on the curbstone; right then the telephone
pole were in back of me."

The defendant told a policeman, who arrived on the scene a
few minutes after the accident, that he was driving east and he "did
not see this lady until he had hit her, he struck this lady and
knocked her down."

"Q. Did he say anything at the time as to what part of the car he had hit her with? A. He says he didn't know; he didn't see the woman until he had struck her and felt the impact against the car, he got out and the woman was lying in the street."

George Oakley, the son-in-law of plaintiff, testified that defendant said he could not figure out how he hit her. Mrs. Oakley likewise testified that the defendant said that he did not know how he hit her; that he was about three feet from her before he saw her. The jury had a perfect right to draw any legitimate inference from this testimony of which it was susceptible.

Counsel for appellant contend that there is no evidence to sustain the charge that plaintiff was struck, as claimed by her in her petition, while standing on the curb. On the night of the accident, before sufficient time had elapsed for deliberation or consultation with anyone, it is fair to observe that there was not a word from the defendant as to where this lady was standing, either in the talk at the home of the neighbor across the street where plaintiff was taken immediately after the accident, or at the hospital to which she was removed within a few minutes after the officers and relatives arrived. There was no talk at that time about her being out in the street. It is significant that at that time the defendant did not point out to the family and the police officers—none of whom had talked to the plaintiff at that time to ascertain from her just how the accident happened—just where the plaintiff was standing when his car came into contact with her. It is also significant that defendant stated that he went back that night and looked for marks on the telephone pole and slow sign. There was no claim that evening by the defendant that he was 3½ feet out from the curb as he drove down that street, and that the plaintiff was out in the street, waving her hands, and coming toward him, and that he could not avoid hitting her. The defendant admits, and admitted to the family and policeman that evening, and to the plaintiff herself, that he struck her, that he was sorry, and that he did not know how he came to hit her. The jury was at liberty to believe her story as to where she was standing. The evidence shows that there was an overlap of two inches by the bumper and that the car could have been driven along close enough to the curb, if she were standing on the curb, in such a way that the bumper would strike her and drag her off the curb. Appellant admits in his argument that if plaintiff were standing on the curb when she was struck, it would

be impossible for a slow-moving car to knock her to the spot where she was found after the accident. The jury was at liberty to take this view also, and to conclude, therefore, that the defendant was driving faster than he claims in his testimony, and that he was driving carelessly and close enough to the curb to hit the plaintiff, and that the very physical facts themselves disputed the defendant's evidence on the witness stand. Counsel for appellant argue that the only testimony as to how and where the defendant was driving his car at the time came from the defendant and in this respect his testimony is uncontradicted, and that it proves the impossibility of his having struck plaintiff while she was standing on the curbstone. Counsel overlook the plaintiff's sworn statement that she was in fact struck while standing on the curb, and the other physicial facts and circumstances surrounding the injury, and evidently the jury believed her statement. At least here is a direct conflict as to where she was standing when she was hit. Here are his admissions that he struck her, and that he was sorry, and that he would look after everything. True, he testified that he never made these statements, but there are four witnesses who state that they heard him.

At the time of the trial, the defendant, in relating to the jury the things that took place, after telling of the condition of the street, how he was driving, and that he was never closer to the curbstone than 3½ to 4 feet, said:

"As I came to the neighborhood of the approach I saw the telephone post and the slow sign, and then as I got further over I saw a party all of a sudden was in front of my car; she appeared to be coming from the south; when first saw this party I would judge she was about three feet from my automobile. I slammed on the brakes immediately; observed it was a lady; saw her throw up her hands and run towards the south curbing, toward me. As to the manner in which she came in front of my automobile from the south and turned and then ran, she came out fast, and got in front of me and she threwed her hands up and turned around and started right back towards me to the south curb. I did not see her leave the curbing, so that just where she came from at that point I am not able to say. As to how much time elapsed as I saw this lady when she appeared suddenly before my car, turned and ran to the south, it was about a second. Upon seeing her I applied my brakes immediately. After I applied my brakes, the car traveled about five or six feet."

The jury might infer that while plaintiff was doing all this, he certainly would have time to go more than three feet. While she was doing all he says, a car would have time at 10 miles an hour to travel 50 feet. The defendant goes on to say:

"When the car stopped I got out and run around the car to see what it was. I was on the left side of the car driving, so I ran around the car, saw a lady lying in the street on the brick. My car at the time was right alongside of her. Her body on the street was lying towards the south; her head was towards the southwest; she was lying slightly on an angle. Her head was near the gutter of the street, right where the approach and the street meets. Her body was on the street lying on the brick. Prior to the time that I saw the lady in front of my car I did not have any opportunity to give a signal of any character; my hands was occupied on the steering wheel; my feet was on the brakes and clutch, for the purpose to come to a stop so I wouldn't hit her. There was no other traffic on the street at that time in that neighborhood."

On cross-examination he first stated that when he saw her he turned his steering wheel to his left, but later said he did not, that he had no time. He was then asked:

"Q. While she was coming towards you six feet from the curbstone in the street? A. She was going southwest making for the curb. She come towards my car to go to the curb. She was about three feet in front of me. She traveled to the side of the car, about two feet.

"Q. If your car had been over a foot farther it would have passed her? A. Yes, sir."

For the most part, the defendant's story is corroborated by his wife and her father who were occupying the back seat of the Ford car. It is established beyond controversy that when the policeman arrived on the scene a few minutes after the accident, the car was standing about three feet from the curb line, practically parallel with the curb. The front wheels were directly north of the east end of the approach to the oil station, or a point 44 feet from the place where plaintiff claims she was standing when struck. She was picked up somewhere near the center of the cement approach, east of the telephone pole. Her body was lying with the head in a southwesterly direction, with the shoulders and head upon the

cement approach, and the rest of her body on the brick pavement. Her bag was picked up back of the car. Her glasses were found next morning at 4 o'clock near this telephone post. She was wearing them at the time she was struck. The nature of her injuries would indicate that she was struck in such a way as to have been dragged or rolled on the rough pavement. The wounds and the condition of her body could not likely have been caused if she had merely been struck and had toppled over. She says that she was lifted up when she was struck. No one saw the accident except the occupants of the car.

The jury had only the statement of the defendant, his wife, and father-in-law with reference to the movements of the car. The defendant says that the car was not moved after he stopped. There is no dispute of their testimony except the physical facts. The jury had a right to weigh the testimony in the light of any inconsistencies or improbabilities found therein. In other words, they were not compelled to accept the defendant's version of the accident as the truth, even though there was no other eyewitness to the accident or no one to dispute the truth of his statement. They had a right to take into account the conduct and appearance of the witnesses on the witness stand and their interest in the result of the trial, the reasonableness of the story told, the defendant's statements or admissions against his interest, the fact that he examined the telephone pole and the slow sign to ascertain whether or not there were any marks upon them, and other circumstances disclosed by the evidence. On the issue of the speed of the car, if the jury found and believed that the plaintiff was standing on the curbstone at the time she was struck, the distance the car traveled after the defendant claims he saw her would be 47 feet. It is defendant's contention that he put on his brakes immediately and that he stopped his car within five or six feet. If it required 47 feet to bring the car to a stop, then it is evident that he was traveling at a much greater rate of speed than claimed by him in his testimony.

The case is one which presented a difficult situation both for the trial court and the jury. However, we are constrained to hold that there was evidence, taking into consideration the legitimate inferences that could be drawn from all the facts and circumstances, from the testimony of the witnesses and the physical facts, to justify the court in submitting all three of the grounds of negligence that were submitted to the jury.

On the matter of the admissibility in evidence of the X-ray pictures, it is the contention of appellant that no sufficient foundation was laid. In the case of Wosoba v. Kenyon, 215 Iowa 226, 243 N. W. 569, at page 573, 574, this matter was fully considered by the court, and we need not repeat what is therein stated as the rule. While the foundation for the admission of the X-ray pictures was not as particularly and definitely shown as might be desirable, yet in view of the rule in the Wosoba case to the effect that "such testimony may be given by either the person who took the X-ray photographs, or another who knows the facts," there was sufficient identification and interpretation of the pictures by the skilled technician who took the pictures and who described the method of taking the pictures, and by Dr. Walker who interpreted them, he being the examining physician and experienced in taking, developing, and interpreting X-ray pictures, to make them competent as evidence. They were not permitted to go to the jury in its deliberation.

Complaint is made by the defendant of instructions given by the court in many particulars, and especially in reference to instruction 9 on preponderance of evidence. The court used the words "preponderance of evidence" and stated that it means, "as the words import, the greater weight of evidence, the evidence of superior influence or efficacy." The words "superior influence" are what is especially complained of. The court goes on to say that "it means that the evidence upon the part of the party upon whom the burden of proof rests must have greater weight in your esteem, have more persuasive import in your calculation, than that opposed to it."

Defendant also especially complains of the court's instruction with reference to contributory negligence, in that the court did not use the term "in any degree". The court used terms which we think were equivalent, such as "free from any negligence on her part that caused or contributed to her injury and damage," and "free from negligence that in any way caused or contributed to her injury." Again the court said:

"If plaintiff has shown by a preponderance of the credible evidence that she acted as a reasonably prudent and cautious person would have acted under like and similar circumstances and acted as a reasonably prudent person in the exercise of ordinary care would have acted under all the circumstances, then plaintiff was free from contributory negligence, and if plaintiff has failed to

establish and prove by a preponderance of the credible evidence that she acted as a reasonably prudent and cautious person would have acted under like or similar circumstances, in view of all the circumstances at the time, then plaintiff has failed to prove herself free from contributory negligence and she cannot recover."

■ Defendant also especially complains of the instruction with reference to the Carlisle Life Tables:

"31. The Carlisle Life Tables have been received in evidence before you, and they show what is known as the expectancy of life at a given age, but you are instructed that you are not to regard such tables as proving that plaintiff will live the prescribed number of years set out in such table. You should bear in mind that plaintiff is liable to die at any time and there is no certainty that she will live the period of time set out in such life tables. These tables, however, are authority on the subject to which they appertain, and as such should be given full weight and consideration by you."

It is this last sentence of which defendant complains, and he cites Droullard v. Rudolph, 207 Iowa 367, 223 N. W. 100, where we condemned an instruction in the exact language of this last sentence standing alone. We think, however, when taken in connection with what preceded it, the instruction is correct.

We have carefully read all the instructions of the court and it would unduly extend this opinion to take up each instruction in connection with each separate objection made. We find nothing in the record which amounts to reversible error or which prevented the defendant from having a fair and impartial trial. It follows that the decision of the trial court must be, and it is, affirmed.—Affirmed.

ANDERSON, C. J., and MITCHELL, ALBERT, PARSONS, and RICHARDS, JJ., concur.