GERTRUDE BECKLEY, Appellee, v. NEW YORK LIFE INSURANCE COMPANY, Appellant.

No. 45385.

JANUARY 21, 1941.

Reed, Ramacciotti, Robinson & Hruska, E. L. Marks, and Fred E. Egan, for appellee.

Milchrist & Marshall and Welch & Acrea, for appellant.

OLIVER, J.—Action at law by Gertrude Beckley, beneficiary in a policy of life insurance on the life of her husband, Ray Beckley, to recover double indemnity for his alleged accidental death. The defendant insurance company paid the face of the policy but contended it was not liable for double indemnity. The policy recites that the double indemnity benefit is payable "upon due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means * * *; provided, however, that such Double Indemnity shall not be payable if the Insured's death resulted, directly or indirectly, from (a) self-destruction; whether sane or insane; * * *."

Defendant's answer admitted insured died while the policy was in effect and denied the other allegations of the petition. It also plead "the assured's death resulted from self-destruction, to wit: self-inflicted gun shot wounds * * *." Trial to a jury result-

ed in verdict and judgment for plaintiff and defendant has appealed.

Insured, Ray Beckley, was about 54 years of age and had for a number of years lived in Missouri Valley, Iowa, with his wife and children. He was manager of a grain elevator at Missouri Valley, and operated a 300-acre farm a few miles distant, belonging to his wife, her sister and mother. The year before his death he had lost some money in the wheat market, but it does not appear that he was in financial difficulties. His disposition was happy, friendly and optimistic. His family life was normal and happy. He and his wife visited friends and he was always in good spirits. He, at no time, showed indications of melancholy or despondency.

On Sunday, June 26, 1938, he had breakfast with his family and left for the farm saying that he would return about 4 p. m. At 12:15 to 12:25 p. m. he was seen cutting weeds on the farm. He was next seen at 1:45 p. m. by the witness Hansen, sitting in his car in Loveland, a town on the road from the farm to Missouri Valley. He said he wanted medical help, and Hansen saw bloodstains on his clothing and took him to the office of a doctor in Missouri Valley, where he was hastily examined before being rushed to a hospital. As he lay upon the operating table in the doctor's office his wife asked him what had happened, and he answered that he went to load the gun.

An examination at the hospital disclosed two bullet wounds in his abdomen, one five and one seven inches below the heart. The bullets had passed through his body and the abdominal cavity was full of blood and clots. These wounds caused peritonitis, from which he died one week later. In the opinion of the doctor, the two wounds were of equal seriousness, either wound was sufficient to cause the peritonitis, and neither wound would have been sufficient to cause death had peritonitis not set in. His general physical condition was very good and he made a normal effort to recover.

The buildings on the farm were unoccupied and Beckley had been alone there. His gun was a .22 caliber forearm action repeating rifle which was kept in the tool shed on the farm, and which he had said he intended to take to his elevator to kill rats.

This rifle was an old model of a type that occasionally discharged without the trigger being pulled. That model tended to catch dirt and cause trouble and for that reason had been discontinued. Beckley's rifle was not clean and the magazine rod was stuck and was moved with difficulty. A defect in the mechanism permitted it to continue firing automatically when the forearm was pushed back and forth and the trigger held down. It had, at one time previously, discharged while Beckley was loading it. In filling the magazine it was necessary to elevate the muzzle in order that the cartridges would drop down into the magazine. In so doing Beckley usually sat down with the rifle butt on the ground in front, and the barrel pointing at his body.

Beckley received two shots in the abdomen. It is appellee's theory that when Beckley was struck in the abdomen by the first accidental shot he slumped forward or doubled up (this is supported by medical testimony) clutching the forearm of the rifle and by his convulsive movements pushing it down three inches and up again thus throwing another cartridge into the chamber which also accidentally discharged. A deputy sheriff, who was a witness for appellant and who had much experience with firearms, testified this could have happened and caused the two abdominal wounds. He also testified to experience in investigating suicides and that suicides usually shoot themselves in the head or chest. When he investigated this case he checked to see if there were any nails, projections or sticks that could have been used to pull the trigger and found none.

There was blood on the floor of the shed and a trail of blood leading into and through the house to and upon a cot where Beckley had apparently lain and attempted to use a (disconnected) telephone before he drove to Loveland, where Hansen found him. Beckley's notebook was found open in the tool shed and written therein, in an almost illegible scrawl, was the following: "Was go to load and ax off 1 2      1:30 such pain have to finish it."

Beckley was educated and was an active business man who could write and spell correctly. The writing, spelling and language evidence his mental and physical condition at the time.

Appellant would read the note—I went to load the gun and it accidentally went off at 12 o'clock     1:30 such pain have to finish it. Appellant states this conclusively established that Beckley intentionally fired the second shot into his abdomen. The doctor testified it was possible that the loss of blood would have caused Beckley to become dizzy and faint, that blood clots would temporarily stop the hemorrhage and he might revive temporarily and the bleeding might start again and he might again become faint.

Appellee contends Beckley was shot twice at the same time (after 12:25) and interprets the note—Was go to load and ax off one two—referring to the two shots. Her counsel say that Beckley did not shoot himself with a third shot at 1:30 as he may have intended but instead tried to get help by telephone and then drove to Loveland. The time element lends some support to this theory because Beckley was seen working at 12:15 or 12:25 and could not have been shot at 12, and also because it is questionable whether, had he fired another shot through his abdomen at 1:30, he would have revived in time to have reached Loveland by 1:45.

■ I. Appellant predicates error upon the refusal of the court to direct a verdict in its favor upon the grounds that the evidence failed to show the death was accidental and conclusively showed it was from suicide. Waddell v. Prudential Ins. Co., 227 Iowa 604, 288 N. W. 643, is cited by both parties and the briefs refer to various other authorities dealing with such questions as burden of proof, affirmative defenses and presumptions.

A discussion of these propositions is unnecessary because we think the evidence of decedent's disposition, the absence of motive for suicide, the circumstances of the shooting with the defective rifle, location of wounds, effort to secure medical aid, statement that it happened as decedent went to load the gun, evidence of the firearms expert and doctor, and other circumstances heretofore detailed, furnished such substantial proof that the shooting was accidental and not suicidal that these issues were clearly questions of fact for the jury without the aid of the presumptions applicable to such cases. Appellant does not strenuously contend the first shot was intentional,

but it argues that the record shows both shots were not fired at the same time and that the second shot was not accidental but suicidal.

The evidence of the firearms expert and the doctor, together with the condition of the gun, accord with appellee's theory that the second of the two shots was fired almost immediately after the first. But appellant argues that the note left by appellee conclusively shows that the two shots were not fired at approximately the same time and that the second shot was not accidental but suicidal. We have already referred to a different construction placed upon this note by appellee as being supported by other circumstances shown in the record.

■ However, though appellant's interpretation of the note be adopted, the result argued by counsel does not necessarily follow. Appellant overlooks the evidence that when decedent was first taken to the doctor's office and placed upon an operating table he was asked what happened and he answered that he went to load the gun. We can interpret this answer in no other light than as a statement that the shooting was accidental. From appellant's standpoint we then have, at best, a declaration of intent to commit suicide and evidence of a subsequent statement that the shooting was accidental. It goes without saying that one who has expressed an intention to do an act is not ordinarily barred and estopped from proving that the act was not thereafter performed. That many persons threaten suicide is a well-known fact, which has never been considered as preventing their beneficiaries showing their deaths were due to other causes. Obviously, Beckley's efforts to secure medical aid tend to prove that if he had previously intended self-destruction, he had then changed his mind. That this change occurred before he proceeded to carry out the first intent is not unreasonable. The evidence of his statement that the shooting was accidental may not be brushed aside as without probative force. Upon the entire record it was for the jury to determine whether the shooting was accidental or suicidal.

■■ II. Appellant predicates error upon the refusal of the court to give certain requested instructions "telling the jury to determine whether either of the fatal shots was fired with the intention of taking life, and that if one was so fired, then under the evidence, the plaintiff could not recover."

Appellant states:

"It is the contention of the defendant that the insured was shot in the abdomen the first time either intentionally or accidentally and being alone and in great pain and being of the opinion that he was about to die anyway, that he wrote this note to explain his death and then deliberately fired a second shot."

An instruction given by the court recites in part:

"* * * if you find that the death of the insured resulted directly or indirectly from the firing of a gunshot by the insured, Ray Beckley, with the intention of taking his life, then your verdict will be for the defendant."

We think this instruction is at least as favorable to appellant as it was entitled to receive. In Travelers Ins. Co. of Hartford v. Melick, 65 F. 178, 27 L. R. A. 629, a leading case, the 8th Circuit Court of Appeals passed upon a similar proposition in considering certain instructions. The insured in that case had received an accidental gunshot wound in the foot causing tetanus, great pain and delirium. While in that state he cut his own throat, being impelled thereto by the intense agony caused by the wound. The trial court instructed the jury that the shot wound might be considered a proximate cause of that injury, and that if his death resulted from cutting his own throat the jury might find that the shot wound was the proximate cause of death within the terms of the policy, which covered death resulting from bodily injuries through external, violent and accidental means alone, independent of all other causes and excluded intentional injuries inflicted by the insured. We quote from parts of the decision approving said instruction [65 F. 178, 184, 27 L. R. A. 629, 633]:

"It must be borne in mind that the doctrine of proximate cause has a different relation to an action for negligence from that which it bears to a contract to indemnify for the result of a given cause. In the former it measures the liability, while in the latter the contract fixes the extent of the liability.* * *

"In the case in hand the original cause is near in time,—only eighteen days * * *. In this case the sequence of events is neither unnatural nor improbable, and the chain of causation seems to

us unbroken.* * * We are forced to the conclusion that, if the jury found the facts as stated in this instruction, they might well find that the shot wound was the efficient cause which set in motion the train of events that in their natural sequence produced the cutting and the death,—the causa causans without which neither would have been. But it is said that this view is erroneous, because the cutting was a new and sufficient cause of the death, which intervened between the shot wound and the fatal result, and thus became itself its proximate cause. This position is untenable, because * * * the cutting was not a new cause, nor a cause independent of the original efficient cause,—the shot wound. It was only an effect of that cause,—an incidental means produced and used by the original moving cause to produce its fatal effect. In the absence of the shot wound the cutting would never have been. That was dependent entirely for its existence and for its effect upon the original accident, and was a mere link in the chain of causation between that and the death. The intervening cause that will prevent a recovery for a death which results from an accidental bodily injury indemnified against by contract must be a new and independent cause, which interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original accidental injury, and produces a different result, that could not reasonably be anticipated. It may not be a mere effect of that injury, produced by it, and dependent upon it for both its existence and its effect. * * * the cutting was neither a new cause nor cause independent of the shot wound, but a mere effect of it. Therefore, it could not have been the proximate or moving cause of the death.''

So in the case at bar the adoption of appellant's theory that the second shot, which appellant contends was one and one-half hours after the first, was intentional and was caused by assured's intense pain and suffering and his belief in his impending death from the first wound, brings this case directly within the rule of the above-cited authority. Indeed, as concerns time and immediate causation, the case at bar appears somewhat stronger on the facts than the Melick case. We conclude the requested instructions were properly refused.

It may be also noted that in the case at bar the evidence showed that either of the two wounds was sufficient to cause the

peritonitis which resulted in the death. Nor was there any evidence that the death was hastened by the second wound, whether received immediately after the first, or one and one-half hours later.

Other errors assigned to instructions if sustained are not of sufficient importance to justify a reversal.

The judgment is affirmed.—Affirmed.

HALE, C. J., and MITCHELL, SAGER, BLISS, GARFIELD, and WENNERSTRUM, JJ., concur.