NICK JOVICH, Appellant, v. BENEFIT ASSOCIATION OF RAILWAY EMPLOYEES, Appellee.

No. 43292.

MARCH 10, 1936.

REHEARING DENIED OCTOBER 2, 1936.

E. A. Lingenfelter, for appellant.

Parrish, Cohen, Guthrie & Watters, for appellee.

RICHARDS, J.—On April 1, 1925, defendant insurance company issued an accident insurance policy on the life of Mike Jovich, plaintiff being the designated beneficiary. The policy contained a provision for payment of $2,000 in event of death of the insured resulting directly and exclusively from bodily injury sustained solely through external, violent, and accidental means (excluding suicide, sane or insane) during the life of the policy. The policy remained in force when the insured died on June 19, 1933, as the result of a gunshot wound. By answer defendant denied that the insured came to his death by such means as to entitle plaintiff to recover, and alleged that the insured committed suicide and because of that fact defendant became discharged from all liability under the policy. At the close of the evidence of both parties, the court sustained defendant's motion for an instructed verdict, and judgment against plaintiff was rendered thereon. The substance of the grounds of the motion was that the undisputed evidence shows the insured came to his death by suicide, and that there is no competent evidence offered in the case which would entitle plaintiff to recover. The only question involved is whether the court erred in sustaining the motion. It becomes necessary to review the state of the evidence in the record, as it was when the district court sustained the motion.

The Raccoon river flows near by the south side of the town

of Valley Junction. Between the river and the town is a tract of bottom pasture land, with scattering small trees and clumps of brush. In this tract a path runs near to and more or less parallel with the river. A sand pump was being operated at the river, and this path seems to have been frequented by those going to and from its location. There was a north and south street crossing this tract known as Sixty-third street. The city dump was in the close vicinity. The path mentioned also extended to a red bridge on the river. At about 6:15 or 6:30 of the morning of June 19, 1933, one Rhiener, walking north on Sixty-third street, met the insured walking south toward the river looking over into the above-mentioned pasture land. The two men were old acquaintances. They spoke to each other and continued on in their respective directions. Rhiener testified that he saw both sides of the insured but saw no gun. South and west from this point, with his feet in the path we have mentioned, the dead body of the decedent was discovered nearly two hours later. There is no evidence with respect to insured during the intervening time. When found the insured had received a mortal gunshot wound. A 32-caliber bullet, having entered his head from the left side just above the ear in the temporal bone, had passed through the brain and lodged on the opposite side under the skin. The insured was wearing his usual work clothes.

To sustain the proposition that the insured committed suicide, appellee points out that there was evidence in the record tending to show the following matters additional to the foregoing: That the insured had purchased a 32-caliber revolver on June 17, 1933; that the bullet which brought about the death was of that caliber; that the gun so purchased was found, one shell discharged and the remaining cylinders loaded, in decedent's left hand, his first finger on the trigger; that insured was left-handed, and the bullet entered the left side directly opposite the point where it lodged in the right side of decedent's skull; that the inside of the hole had a seared appearance; that the weeds were not broken down or disturbed except where the body lay; that decedent worked intermittently, owed his landlady for room rent, had been in jail, drank to a considerable extent, had accumulated no property, was without immediate relatives, and unmarried.

There was a conflict in the evidence as to some of the matters

mentioned in the preceding paragraph, as there was also evidence tending to establish: That on the same Saturday afternoon of the purchase of the gun decedent visited his attorney, making arrangements to pay an account he owed, and at the time seemed perfectly normal and natural and good humored; that the gun was not in decedent's hand when the body was found but was lying on the ground near the body, and could be seen as one approached the body; that decedent wrote with his right hand, sometimes working left-handed with a sledge; that where the body lay the soil was sandy and vegetation sparse; that decedent had employment with the railroad company as a car inspector for many years preceding decease; that decedent's incarceration in jail was in 1932, from August 20 to September 10, on which latter date the charges made against him were ignored by the grand jury; that decedent was about 35 years old, about 6 feet tall, weighed about 190 pounds, was in good health, physically strong, was of good disposition, jovial, easy to get along with, well liked by those who knew him; never drank to such extent that he could not talk, walk, and take care of himself; that the skull where the bullet entered, and where on the opposite side it failed to pass through, is the thinnest part of the skull, of a thickness equivalent to about three sheets of paper; that it was where the skull was of this thickness that the bullet entered and failed to emerge on the opposite side; that the wound was just a little hole, clean cut; that there were no powder burns; the area around the wound was not burned and there were no marks outside the bullet hole; that there was no imprint of a gun barrel around the wound; that there was not noted any singeing of the hair; that on decedent's back from the nape of the neck, down his back to the buttocks, and extending down the leg into the shoe where the sock covered the foot was an extended area of blistered skin surface, the blisters on the foot being ruptured; that the blisters were deeper in the flesh the further they extended downwards toward the feet; that in the opinion of appellant's expert these blistered surfaces had been caused by scalding hot water, in the opinion of appellee's experts had been caused by the body lying in the sun for two or three hours in the position where originally found; that on the left leg above the knee was a superficial wound four and one-half inches long that was in the process of healing; that a 32-caliber revolver is a powerful gun; that

a bullet from the revolver in question would penetrate a human head; that on account of the thinness of the skull where the bullet entered it would offer correspondingly slight resistance; that in the opinion of witness the gun was held at a considerable distance when fired; that decedent's room was searched after his death, and when the room was again entered after the funeral there was found a box of 32 shells on the desk that were not there when the first search was made.

In considering this state of the record, the district court in ruling on the motion for directed verdict, in view of the issues and record, was bound to take into consideration the presumption that death is not due to suicide, although the existence of such presumption does not create a legal situation in which the question whether decedent committed suicide must invariably be submitted to the jury. The rule is that when the nonexistence of the presumed fact is conclusively established by the record, the existence of the presumption does not make a jury question as to whether the presumed fact did or did not exist. Warner v. Equitable Life Ins. Co., 219 Iowa 916, 258 N. W. 75. The question then before the district court was whether the record, aided by every intendment in favor of the appellee, conclusively established suicide; or in other words, whether the evidence was such that all reasonable minds must conclude that the presumption has been overcome, suicide proved, and any hypothesis or theory, inconsistent with suicide, excluded. Wilkinson v. Nat. Life Ass'n, 203 Iowa 960, 211 N. W. 238.

In Inghram v. Nat. Union, 103 Iowa 395, 72 N. W. 559, one of the matters discussed as material on the question of suicide was the place and surroundings where decedent received his mortal gunshot wounds. In that case the tragedy was in a small closed office vault, the extreme dimensions being seven feet. The nature of the place, and the appearance of the wound, led the court to eliminate all possibility that the fatal shot had been fired by any person other than decedent. It may also be noted that in Green v. New York Life Ins. Co., 192 Iowa 32, 182 N. W. 808, and Warner v. Equitable Life Ins. Co., 219 Iowa 916, 258 N. W. 75, relied on by appellee, the decedent received his fatal gunshot wound while alone in a room in his own home. But in the case at bar, we do not start out, as in the Inghram case, with such necessary assumption. The reason is that, when fatally wounded, the decedent was in such a place that he was

not beyond the operation and results of human agencies, other than himself. The result is that in this case there is this distinction from the three cases last above mentioned, that is, in the case at bar the jury as a part of their duty would consider the possibility of other human agencies as causations of decedent's wound. The jury in proceeding on such course of inquiry could find from the evidence that the decedent when killed was in a pasture along the river where were thickets of trees and clumps of brush, with a city dump in the vicinity, and could find that when shot he was walking along the path in which his feet still remained when his body was found. They could find from the evidence that the mortal wound was a little hole, clean cut. They could find that there were no powder marks or other discolorations on the surface around the hole; that decedent was shot with a bullet of 32-caliber. They could find that guns of this caliber are powerful weapons; that such a projectile would ordinarily pass through a human head; that the bullet entered decedent's skull at a point of its greatest thinness, where lessened resistance to the passage of the bullet results from such thinness; that the bullet after so entering passed through the tissue of the brain and broke the wall on the opposite side of the skull at a place of like thinness, but without sufficient force to emerge. The question is whether these facts that the jury could have found from the evidence, supported by the presumption that man, endowed with the strongest of all animal instincts, that of self-preservation, does not commit suicide, would be of such reasonable force in the minds of reasonable men that some would say suicide had not been conclusively established. In seeking answer to such question, it is not necessary that plaintiff set up, or prove the truth of, any particular theory of the exact manner of the insured's death. Michalek v. Modern Brotherhood of America, 179 Iowa 33, 161 N. W. 125. ''We would not be warranted in bending or breaking the rule [the presumption mentioned] simply because there is difficulty in explaining just how deceased met his death.'' Wood v. Sovereign Camp of Woodmen, 166 Iowa 391, 147 N. W. 888, 892. Assuming from this evidence, as we think a jury could have done, that it was a bullet of more or less spent velocity that entered decedent's head as decedent was walking along the path, in this out of the way locality along the river where shooting of firearms is more to be anticipated

than in improved localities, it would seem that there would be difficulty in saying that all reasonable persons would arrive at a common judgment that suicide had been conclusively established.

Appellee would exclude other human agencies, starting out with the assumption that decedent fired the shot from his own gun. Proceeding on such assumption, appellee says that the straight-in course of the bullet establishes intentional shooting, because decedent must have placed the gun against the side of his head with his left hand and fired. But in Wood v. Sovereign Camp of Woodmen, 166 Iowa 391, 147 N. W. 888, 891, the insured was found in his own bed with a similar mortal wound in the temple, the bullet having gone straight in. The same argument was urged as is made by the appellee here. In discussing same the opinion says: "It is difficult to satisfactorily account for the bullet wound in the temple, and going straight in, as some of the witnesses say, on the theory of accident. But this is often the case, and was so in some of the cases cited where a verdict and judgment against the insurer was sustained. There are many ways in which people are shot. No one knows how this man was injured. It is possible that he was shot, as he was, accidentally, and it may have been so." On all the facts in that case it was held the evidence justified submission of the question whether deceased took his own life or was accidentally shot. Appellee also urges that suicide is conclusively established by the fact that a bullet had been discharged from one of the chambers of decedent's own revolver. There was evidence from which the jury could find that decedent's revolver was lying on the ground near his body, not in his hand as testified by appellee's witness, with the one chamber discharged and the remaining chambers loaded. It is undisputed that the wound was inflicted by a bullet of the same caliber as decedent's revolver. Admittedly this circumstance, unexplained, might appear to a jury as of considerable weight. But it is not perhaps of such weight as might at first blush appear, because there are multitudes of 32-caliber revolvers or other firearms in the hands of the public, and the record is such that the jury would not be compelled to conclude that this particular bullet was fired from decedent's gun. If the possibility that decedent was struck with a spent bullet from a gun in the hands of some other person be recognized, and we think it must be, then the fact that

a cartridge had also been discharged from decedent's gun presents nothing conclusive, there being no effort made to show whether this one shot from decedent's gun was of recent or earlier occurrence, and to say that it had not been earlier discharged is an assumption with little or nothing to determine its value as an assumption. Further, the jury would have the right and the duty to give consideration to every fact and circumstance in evidence. Among these circumstances is this peculiar thing, the condition of the skin on decedent's back and leg and running down into his shoes, unexplained excepting that the jury could find from the evidence that it was a blistered condition resulting from scalding hot water, or could have found it was caused as claimed by appellee, by sunburn after death, rather improbable in view of the deepest burn being on the foot inside the shoe on the dead body. The condition was such that its origin was very recent. The jury could find from the evidence that the hot water was applied in some manner to decedent's back, course downwards, and the burns were the most severe where the water ran into his shoe and was held by his sock. What or who caused this injury, whether it was accidental, whether it was an intentional effort to harm the insured, whether his mission into the pasture had association therewith, whether some person satisfied an urge of malevolence by the shooting at decedent in the pasture, whether such person discharged one cylinder of decedent's revolver and left it on the ground beside his body, whether there is significance in the placing of some 32-caliber cartridges by some person on a desk in decedent's room, the cartridges not being in decedent's room upon a previous search after his death, are all queries, the answers to which may be integral parts of the real truth respecting the death of the insured, if the remainder of the facts of which they may be elements were known. For instance, had the decedent's gun been examined by a competent person for fingerprints thereon, it is possible it would have been a fact leading to establishment of homicide rather than suicide. No such examination was made. And in that connection it has been held that an injury is accidental as to the insured even though it was intentionally inflicted by some wrongdoer. Allen v. Travelers' Protective Ass'n, 163 Iowa 217, 143 N. W. 574, 48 L. R. A. (N. S.) 600. It was the duty of the jury when they considered these facts they could have found from the evidence,

to throw in the scale therewith, in plaintiff's favor, the fact of universal knowledge and observation that sane men do not generally seek death, but rather at all times are solicitous to avoid it. We have reviewed with care the fact situation in our earlier cases holding that suicide had been conclusively proven. Our conclusion is that the showing therein by defendant insurance companies embraced many indisputable fact elements not found in the case at bar. For the reasons stated we are compelled to conclude that the evidence was such that the minds of reasonable men would differ on the question that is involved, and that suicide was not conclusively established in this record.

The district court should have overruled defendant's motion. The case is reversed.

Appellant's motion to strike appellee's amendment to abstract is overruled.—Reversed.

DONEGAN, C. J., and ALBERT, KINTZINGER, PARSONS, ANDERSON, and HAMILTON, JJ., concur.