MARGARET L. WADDELL, Appellee, v. PRUDENTIAL INSURANCE COMPANY, Appellant.

No. 44956.

NOVEMBER 21, 1939.

REHEARING DENIED MARCH 16, 1940.

Henry & Henry, for appellant.

Casper Schenk, for appellee.

RICHARDS, J.—Plaintiff seeks to recover as the sole beneficiary named in a policy of insurance upon the life of her husband, John Berl Waddell. The insurer is the defendant. The insured suffered a gunshot wound and his death immediately ensued. He died within 2 years from the date of the policy. That fact, and a provision in the policy limiting the insurer's liability to the amount of the paid premiums in event of death by suicide within such 2-year period, were defensively plead in the first division of defendant's answer together with the further allegation that the insured did die by suicide. The cause was tried on the merits. Upon a verdict for plaintiff in the full amount she claimed a judgment was rendered against defendant wherefrom it has appealed.

At the close of the evidence defendant moved that a verdict in favor of plaintiff be directed for the amount of the premiums paid, i. e. $70. The motion was overruled. One of appellant's complaints is that this ruling was erroneous because it was the duty of the court to find as a matter of law that the insured had committed suicide during the 2-year period named in the policy, and so finding to limit recovery as contemplated in the motion.

The answer to the question of fact involved in the motion cannot be found in the testimony of any witness who observed the tragedy. It occurred at about six o'clock a. m. on April 25, 1938. On the previous evening the insured and his wife and two children, having been invited to come, had arrived at the farm home of the parents of plaintiff near Des Moines, after an all-day trip by train from Lansing, Michigan. This farm home faced toward the south. A plat indicates there were six ground floor rooms. They were not of large dimensions. One was 7 feet 8 inches long measured east and west and 5 feet in width measured north and south. This small room is also mentioned in the record as a closet and for convenience we will adopt the term for its designation hereinafter. It was being used for storage of various household articles and supplies. In its east wall was a window affording an outside view. The plat and photographs show a door in the closet's west wall that opened into the living room. To this door we have found no reference in the oral testimony. In the north wall of the closet was another door providing a means of entrance from the dining room. This door was hinged at approximately the western extremity of the north wall of the closet. In being opened it swung inside the closet. Upon the south wall of this closet a wooden cupboard was affixed. Its depth was 12 inches, and it reached from the ceiling to within 34½ inches from the floor. It was 5 feet 10 inches in length and extended from the westerly extremity of the south wall toward the east to a place where a wardrobe stood against the remainder of the south wall. This last mentioned wardrobe was 21 inches deep and 4 feet 8 inches in height. Against the north wall of the closet was another wardrobe that rested on the floor. Its depth was 16 inches, its height 6 feet 8 inches. Its west end was 6 inches east of the east edge of the door that opened from the dining room, thus leaving a clearance of 6 inches when that door started to swing into the closet upon being opened. This wardrobe extended toward the east to within 4½ inches of the east wall of the closet. In this space of 4½ inches plaintiff's father was keeping a shotgun he had had for 25 years. It was a discharge from this gun that caused the death of insured while he was in the closet. During the night that preceded his death the insured and plaintiff occupied a ground floor bedroom located in

the southeast corner of this home. When morning came insured arose and dressed, and was about to go out from the bedroom when plaintiff's mother met him as she came in. Not long remaining the insured walked out into the living room. During the brief interval he was alive thereafter he was not seen by any of the witnesses. Within a minute or two after he departed plaintiff and her mother heard a sharp noise. They left the bedroom, hurried through the sitting room and into the dining room. The door from that room into the closet was open a little ways, enabling them to see the insured lying in the closet. Plaintiff reached in and placed hers on her husband's hand and screamed to her mother that he was dead. Plaintiff returned to the living room and lay prostrate on a davenport. The body of insured was lying in the closet on its back excepting that the head was resting somewhat against the west wall. The feet extended toward the east and the head was toward the west. One witness says the position was somewhat northwesterly and southeasterly. The body was behind and in such close proximity to the door from the dining room that the coroner who soon arrived found it necessary to push the door open and enter sideways. The shotgun was lying across decedent's legs, the muzzle pointing toward the door. Decedent's left hand "was up on his chest," the right hand "down to his side." Neither hand had "hold of the gun." The coroner testified there was no wound on decedent's face below the eyes; that the forehead was intact except for the wound extending slightly below the hairline about the middle of the forehead; that the top of the head was not intact; that portions of the top of the skull bone were missing and pieces were lying about, one in another room; that there were marks of brain matter on the walls and ceilings of the closet and of the dining room; that the hair on the head had not been carried away, but the scalp was split. The undertaker stated that the wound was approximately 1 to 1½ inches in diameter and more or less oblong. He also stated, "I don't remember exactly about whether the wound was jagged, but I would rather say it was jagged." He stated it had the appearance of Exhibit L to which another reference will be made.

From the foregoing appellant says it appears conclusively that, when the gun discharged, it was slanting upward in a northerly direction, the dining room door was open, and the in-

sured was leaning over and practically looking down the barrel, and had placed the muzzle against his forehead. Appellant urges that the inevitable conclusion is that insured intended to and did destroy himself. To fortify the conclusion appellant says that in the assumed position the insured, whose height was 5 feet 8 inches, ''could have pulled the trigger or could have set off the trigger by pushing it with a small stick or with his toe.''

Two important elements of this theory, and on which this conclusion seems bottomed, are (1) that the muzzle was against insured's forehead, and (2) that he pulled or set off the trigger. The record is such that neither of these elements appears with what can be deemed conclusiveness. The only expert evidence that was introduced was such as to warrant a jury finding that, had the muzzle of the gun been against the insured's forehead, there would have been neither powder marks nor burns on the surface around the wound. Associated with that evidence the jury could have found that, though none of the blackening from powder marks was observed, there were burns that were described by the undertaker as ''a number of red pockmarks in the skin of the forehead.'' Nor is that all the record disclosed. As has been stated, the undertaker described the wound as having the appearance of Exhibit L. This exhibit was one of several, consisting of sheets of white paper toward each of which at a measured distance this shotgun had been experimentally fired by one of plaintiff's witnesses. Exhibit L had been at a distance of 3 feet from the muzzle. The hole resulting was somewhat oblong and the dimensions were approximately 1 inch by 1½ inches, possibly a trifle less. Around the hole appear scattered spots or dots. Exhibit K held at a distance of 1 foot from the muzzle shows an approximately round hole surrounded by a small blackened area. Such a blackened area does not appear on Exhibit L. Exhibit J held at a distance of 3 inches from the muzzle shows around the hole a blackened surface 8 inches or more in circumference. The holes in Exhibits K and J were less than an inch in diameter. As nearly as we can approximate from these two exhibits the diameters measure three fourths of an inch. In view of the matters we have mentioned, appearing in the record, it is by no means conclusively shown that the muzzle was against decedent's forehead. On the contrary there

was evidence from which a jury could have found that the muzzle was at some distance from the forehead of insured when it discharged.

The other element found in appellant's theory, namely, that insured pulled the trigger or in some other intentional manner set it off, also lacks conclusiveness. For a significant and undisputed fact is this—the gun, after 25 years of use, was in such condition that its discharge did not depend upon the pulling or setting off of the trigger. After the death of insured the experiment was tried of striking with a wooden stick 1¼ inches thick and 13 inches long the hammer of the gun. A discharge resulted repeatedly. In view of the nature of the surrounding objects in the closet, among these an ice cream freezer, and the cramped place the closet afforded, we think it by no means conclusively appears, as appellant assumes, that the trigger was pulled or in some other intentional manner set off.

One of appellant's arguments is that, as insured was walking with the gun from the east end of the closet to the door, any accidental discharge would have resulted in the charge taking a different direction than it did, and the wound inflicted, if any, would have been in some portion of insured's body other than his forehead. Appellant says this shows conclusively that there was nothing accidental in what happened. One weakness inherent in appellant's conclusions is that in its premise is a pure assumption of an unestablished factual matter, i. e., that insured was walking toward the door when the gun discharged. It excludes other factual possibilities, as for instance, that insured may have been standing near the door, and for some purpose attempted to set down the gun on the south side of the closet where in the space between the cupboard and the floor, and also behind the door when it was in a partly opened position, there were such objects as would discharge the gun upon coming into forceful contact with the hammer as the gun was set down. But it is not necessary that appellee set up or prove any particular theory of the exact manner of the insured's death. Michalek v. Modern Brotherhood of America, 179 Iowa 33, 161 N. W. 125. The possibilities of an accidental discharge in some way occurring with a gun such as this one, in the close confines of this closet containing various substantial objects, do not appear to be mere figments of the imagination.

From the evidence it possibly could be inferred that insured knew that the gun was being kept in the closet. Appellant urges that because of this knowledge the insured's going to the closet and getting the gun show beyond doubt that it was for the purpose of taking his life. It would seem however that the mere facts that insured knew the location of the gun, if he did, and went there and procured it, without more, in no way identify any particular purpose. From these facts the existence of some purpose might be imputed to insured. But, to determine what the purpose was, one must have fuller information—in this case the circumstances and surroundings. Only from all of these should it be determined rightly, if it is possible of determination at all, what was insured's purpose. It may be added that one of these circumstances is this. On a prior occasion when decedent had visited in this home he had been shooting with the gun for entertainment or as a pastime. He was again making a visit to the same home. On this morning the father-in-law and hired man were already outside the house somewhere on the place. There does not appear to have been wholly excluded the possibility of a like intended use of the gun on this occasion.

 Insured had been employed for a number of years by the Reo Motor Company as an upholsterer. Several months prior to his death this employment had been terminated. That fact was disturbing to insured and the worry it occasioned was observed by some of the witnesses. After death $132 was found in a pocket of the clothing he was wearing. Insured was devoted to his children and wife and it was seemingly on account of solicitude for their maintenance that his unemployment had caused him to make untiring efforts to again find work at his trade. But this testimony, added to and considered with the other matters in the record, is not of such weight as to make it appear conclusively on the whole record that insured died by suicide. Unless that appeared conclusively the motion was properly overruled. In our opinion it does not so appear. We need not here discuss the burden that rested on appellant, so recently considered in Jovich v. Benefit Association, 221 Iowa 945, 265 N. W. 632, in the light of our previous holdings. As pointed out in the cited case, in some of our opinions weight has been given the fact that the insured was in such a place that

he was beyond the operation and results of human agencies other than himself. But each case must depend on its own facts. In the instant case the inconclusiveness of appellant's showing appears although there is no showing of a possibility of intervention by other human agencies. The question decided is that the results of insured's own actions, as reconstructed from the circumstances and surroundings, may have been intentional or may have been accidental.

By the terms of the policy the face amount of the insurance was $1,000, but there was a provision for benefit in an additional sum of $1,000 in event of death by accidental means. There were also contained in the policy other provisions by reason of which in the trial the theory of both parties seems to have been that in order to be entitled to the additional $1,000 the burden of proof was upon plaintiff to establish, among other things and by a preponderance of evidence, that the death of the insured resulted from bodily injuries sustained by accidental means. The court so instructed. One of appellant's complaints is that the court erred in submitting to the jury the question whether plaintiff had successfully carried her burden of proof. Appellant says there was not any evidence from which it appears that death resulted from accidental means. But we have already pointed out that there was circumstantial evidence tending to establish that the discharge of the gun was accidental, and there was a presumption having probative value in favor of the theory of accident. Stephenson v. Bankers Life, 108 Iowa 637, 79 N. W. 459; Martin v. Bankers Life, 216 Iowa 1022, 250 N. W. 220. We are of the opinion that a jury question was generated. Other assignments of error pertain to the instructions and to requested instructions. Some of the points raised are determined in the foregoing. Other assignments concede the court's rulings accorded with long established precedents in this jurisdiction. We have found in appellant's argument no sufficient reasons for overturning these holdings. No error appearing the judgment of the trial court is affirmed.—Affirmed.

OLIVER, C. J., and HALE, HAMILTON, MITCHELL, BLISS, and STIGER, JJ., concur.

SAGER and MILLER, JJ., dissent.