GRACE BERRY BROWN, Appellee, v. METROPOLITAN LIFE INSURANCE COMPANY, Appellant.

No. 46013.

6

DECEMBER 15, 1942.

REHEARING DENIED MARCH 19, 1943.

Henry & Henry, of Des Moines, for appellant.

Stipp, Perry, Bannister & Starzinger, of Des Moines, for appellee.

OLIVER, J.—In 1923 and 1926, appellant issued two life insurance policies and an accident policy insuring decedent, Carl W. Brown, husband of appellee. Assured was killed September 24, 1940, by the discharge of a shotgun. This suit involves only the provisions of said policies for the payment of accidental death benefits upon receipt of proof "of the death of the insured * * * of bodily [injury] injuries sustained through external, violent and accidental means." The sole question is whether he came to his death as the result of an accident or committed suicide.

Mr. Brown, aged 49 years, lived in Des Moines with his wife and his son Robert, who attended college in that city. His other son, Carlton, was married. Mr. Brown had worked for Queal Lumber Company for many years, had never missed a day of work without pay, and had risen to the position of buyer for its two Des Moines yards and wholesale department, at $325 per month. His family relations were happy. He belonged to

a church and two clubs, owned his home, and had no financial difficulties.

In 1938, Mr. Brown was treated for arthritis. Apparently, he made a complete recovery from that ailment. He was of a nervous disposition. In August 1940, he was suffering pain, was nervous and irritable, had been unable to sleep, and appeared to lack mental vigor. On August 30th, he went to a hospital where he was given sedatives and diabetes tests and kept in bed for two days. After that he took walks. He was discharged from the hospital September 6th. The doctor referred to him as "potentially diabetic." One in this condition should follow a prescribed diet but requires no insulin. More exercise, such as walking, was prescribed. For a time after his return from the hospital, Mr. Brown took some of the sedatives given him while there, but soon stopped entirely and before his death was sleeping naturally.

On Sunday, September 22, 1940, Mr. French, president of Queal Lumber Company, called upon Mr. Brown. Although Mr. Brown appeared to be somewhat nervous, he was in good spirits and spoke of resuming work the next morning. Mr. French told him he should not drive himself back; that his job was waiting and his pay would continue. Appellee then suggested to Mr. Brown that he had some teeth to be cared for and it would be better to have that done before he returned to work and then he could stay on the job. Mr. Brown said he would do that.

On the same day some out-of-town relatives dined with the Browns. Mr. Brown presided and was in his usual good humor. Monday evening Carlton, his wife, and her sister were at the home for dinner. Before dinner Mr. Brown played cribbage with Carlton, and afterward visited with the others, listened to the radio, and played bridge. He enjoyed himself and was in very good spirits.

Tuesday, the day of Mr. Brown's death, the Browns arose at seven and breakfasted together. After helping wash the breakfast dishes, Mr. Brown took a brisk walk. Appellee was in the basement washing clothes. About eleven a. m. Mr. Brown asked her if there was anything he could do to help her. She said "no," but he might wash some potatoes and put them in

the electric cooker. This was done. At noon Mr. Brown did not appear for lunch. Appellee went to the second floor to look for him, saw "that there had been an accident," and ran to Mr. LaRue's house next door for help.

Mr. Brown's body was in a closet on the second floor. The closet door was open and an electric light in the ceiling was lighted. This closet is 7 feet 3 inches long, east and west, and 28 inches wide. The door is in the center of the south side of the closet and swings outward from the closet. The ceiling of the closet slopes sharply downward from south to north. At the south side it is 7½ feet high and at the north only 5 feet high.

There were shelves at each end of the closet and also cross-poles for clothes hangers. At the time the hangers on both ends were full of heavy clothes. There were also clothes hooks and clothing along the side walls, and shoes on the floor. Miscellaneous articles were stored in the west part. In the east end was a shoe rack with a cleat to catch the heels of shoes, suitcases, a card table, and a bag of golf clubs. Standing in the northeast corner of the closet were a single-barrel 12-gauge hammer gun belonging to Mr. Brown, and his son's 16-gauge gun. There was also a rifle in a case on the floor. The shotguns were standing in the corner behind the clothes. "Anyone reaching in to pull out one of the shotguns would have to pull it past the card table and clothing and shoe rack."

Mr. LaRue was the first person upon the scene. He found the body with the shoulders and head slumped against the west wall of the closet, a little above the floor, and the feet stretched out to the east practically across the doorway. He testified two shotguns were lying on the floor, both to the left of and north and east of the body. The next witness to arrive said there were two shotguns on the floor. A witness who came soon afterward saw only one shotgun on the floor beside the body. The coroner testified the 12-gauge gun was the only one lying on the floor and that the butt was near Mr. Brown's feet and the barrel on his chest. A police sergeant, who arrived shortly thereafter, saw two shotguns leaning against the wall outside of the closet.

Mr. Brown was killed by a charge from the 12-gauge gun, which entered his neck below the left ear slightly below the

angle of the jaw, passed through his neck and came out through the right side of his face and jaw. The coroner testified no pits or powder marks were discernible around the outside edge of the wound. In his opinion the muzzle of the gun was pressed against the flesh when it was discharged. The embalmer testified:

"I noticed there were powder burns around the wound. * * * I know there was powder marks around there."

The gun, when discharged, pointed upward and apparently somewhat to the west. Photographs show numerous shot marks in the west side of the door frame and the west part of the top of the door frame and the southwest part of the ceiling of the closet. There was no evidence of any article near the body, such as a stick, with which the gun could have been fired. However, a witness for appellant demonstrated that by twisting his neck and body and bending his left knee he could hold the barrel with his right hand and pull the trigger with his left, with the gun in position to shoot vertically and through his neck from the left side. The witness was unable to reach the trigger when the gun was pointed upward at a 66-degree angle.

Ammunition for the guns was kept in a cupboard in the kitchen. A cardboard box with a capacity of 25 loaded 12-gauge shells was found there. The box contained only 24 shells but they were of two different makes intermingled and the evidence shows it had been the practice to replenish the supply as a few shells were from time to time used.

The guns had been habitually kept in the same corner of the closet and had at times been found loaded. Robert had been hunting about two weeks before his father's death. At that time he cleaned his rifle and shotgun and the outward surface of his father's gun. It will be noted this was done in the kitchen. Mr. Brown was present and remarked he was going to glue or repair a splinter from the hand rest of his gun, and also the hand rest itself, which came off when the gun was fired. The firing mechanism of his gun was in good condition.

I. It is contended the court should have directed a verdict in favor of appellant for insufficiency of proof of death through accidental means. In this case, recovery was sought under that part of the insuring clause which provided indem-

nity for death through accidental means only. Therefore, the burden was upon appellee to prove that proposition. Taylor v. Pacific Mut. L. Ins. Co., 110 Iowa 621, 623, 82 N. W. 326.

■ Although there is no direct evidence thereof, it is clear said death resulted from the discharge of the gun, which was either accidental or with suicidal intent. In the absence of direct evidence, a presumption arises that a wound was not intentionally inflicted either by the assured or by another. This presumption is available as affirmative evidence in a suit upon an accident or life insurance policy. It has been said that from it may be drawn the inference that the wound was caused by accidental means, as the only alternative. Dewey v. Abraham Lincoln Life Ins. Co., 218 Iowa 1220, 1225, 257 N. W. 308, 310; Caldwell v. Iowa State Traveling Men's Assn., 156 Iowa 327, 136 N. W. 678; Martin v. Bankers Life Co., 216 Iowa 1022, 250 N. W. 220. In Stephenson v. Bankers Life Assn., 108 Iowa 637, 641, 79 N. W. 459, 460, the court said,

"* * * there is a presumption in favor of the theory of accident."

Appellant contends the presumption against suicide does not have the effect of evidence and asks that we overrule our long line of decisions to the contrary. In Reddick v. Grand Union Tea Co., 230 Iowa 108, 119, 296 N. W. 800, 805, we recently considered our previous holdings and declined to overrule them. In Allison v. Bankers Life Co., 230 Iowa 995, 999, 299 N. W. 889, 891, we again passed upon the proposition and again held the presumption against suicide has the effect of evidence. These holdings reaffirm a rule which has been followed for more than half a century. We are not prepared to recede from it.

The presumption against suicide is a strong one. It has been said to have its basis in the love of life and the instinct of self-preservation, the fact that self-destruction is contrary to the general conduct of mankind and that suicide by a rational man is an act of moral turpitude. In Michalek v. Modern Brotherhood of America, 179 Iowa 33, 42, 161 N. W. 125, 129, the court said:

"While, in cases where the fact of suicide is so glaring as

to afford no possible grounds for dispute, the courts will not hesitate so to hold, yet they are quite infrequent, and especially so where, as here, the conclusion is to be drawn in any material degree from evidence which is purely circumstantial.''

In Allison v. Bankers Life Co., supra, the following statement from Ryan v. Metropolitan Life Ins. Co., 206 Minn. 562, 571, 289 N. W. 557, 561, is quoted with approval at page 1002 of 230 Iowa, page 893 of 299 N. W.:

'' 'In rare cases is the evidence of suicide so persuasive as, not only to dispel the presumption, but also to require decision, as a matter of law, that death was not accidental.' ''

And Reddick v. Grand Union Tea Co., supra, states at page 118 of 230 Iowa, page 804 of 296 N. W.:

''If the facts surrounding death can be reconciled with any reasonable theory of innocence or accidental cause, that explanation will be adopted.''

Appellant contends the evidence of Mr. Brown's illness is proof of a motive for suicide. Mr. Brown had recovered from his illness as far as the necessity for further treatment was concerned. He was ready to return to work. He was ''in his usual good humor.'' There is no suggestion that his habits were other than exemplary. The record indicates he was steady and industrious, a successful citizen with a happy home life and pleasant business and social connections, and with no financial difficulties. Although the absence of proof of motive does not prevent a finding of suicide, it is a circumstance entitled to some weight. The jury may have found the circumstances in this case indicated the absence of any motive for suicide and tended to point to accidental death. Allison v. Bankers Life Co., supra.

Appellant argues ''there was no occasion whatever for the insured to be in this closet with the gun at the time his death occurred, except for the purpose of obtaining the gun with a suicidal intention.'' This argument overlooks the evidence of Mr. Brown's expressed intention to repair the hand rest of the gun. Although there was no evidence that he proposed to do this work at any particular place, it appears that when the son cleaned the guns he took them to the kitchen.

Another circumstance relied upon by appellant as indicating suicide is the position of the muzzle at the time the gun was discharged. Appellant assumes the record conclusively shows it was pressed against the flesh. If, as some of the testimony indicates, there were powder marks or powder burns around the wound, this assumption would appear unjustified. That the charge did not travel far is indicated by the small size of the entrance wound. Nor was it possible for the man and gun to have been far apart in this closet.

Appellant also asserts the direction of the discharge, the narrow confines of the closet, and the location of the shot marks demonstrate that when the gun was fired Mr. Brown was in a standing position, with his head and body bent over to the left so his neck was parallel to the floor, and that he could not have been in this strained position with respect to the gun except intentionally. It will be remembered a witness for appellant demonstrated how a person could shoot himself through the left side of the neck by holding the barrel with his right hand and pulling the trigger with his left.

Appellant's argument again overlooks the record. Said argument is based upon the assumption that only one shotgun was found lying beside the body and that at the time of its discharge Mr. Brown was handling it in a certain manner. The first witnesses upon the scene testified two shotguns were lying beside the body. From this testimony the jury may have drawn the inference that Mr. Brown had two shotguns in his hands or arms at the time of or immediately prior to the discharge. Under the rule that the record will be viewed in the light most favorable to appellee, appellant's theory of the circumstances of the discharge of the shotgun must be deemed inconsistent with the record.

Furthermore, there would be a greater possibility of accidental discharge when two shotguns were being handled together in a narrow and obstructed place. Nor is it likely that one intentionally shooting himself with one shotgun would at the same time be holding another shotgun.

Appellant did not have the burden of proving suicide. However, it had the duty of going forward with the evidence to

rebut the presumption. Allison v. Bankers Life Co., supra. We conclude the circumstances shown in the record were insufficient to rebut the presumption so as to require a finding of suicide as a matter of law.

Practically all the propositions involved in this phase of the case were passed upon in Allison v. Bankers Life Co., supra. That decision reaffirms the rule that a plaintiff is not required to set up or prove any particular theory of the exact manner of the insured's death. See Waddell v. Prudential Ins. Co., 227 Iowa 604, 609, 288 N. W. 643, 646; Jovich v. Benefit Association, 221 Iowa 945, 950, 265 N. W. 632, 634. It also discusses the rule that a plaintiff is not bound to negative every other theory or hypothesis of causation in order to establish his own. The requirement is only that the evidence be such as to make that theory reasonably probable, and more probable than any other hypothesis based on such evidence. Whetstine v. Moravec, 228 Iowa 352, 291 N. W. 425; Latham v. Des Moines Electric Co., 229 Iowa 1199, 1207, 296 N. W. 372, 375.

We hold that under the record in the case at bar the question whether the death was from accidental means was for the jury. Although no two cases are factually the same, our conclusion finds support in the following: Waddell v. Prudential Ins. Co., supra; Michalek v. Modern Brotherhood, supra; Wilkinson v. National Life Assn., 203 Iowa 960, 211 N. W. 238, second appeal, 208 Iowa 246, 225 N. W. 242; Tomlinson v. Woodmen of World, 160 Iowa 472, 141 N. W. 950; Stephenson v. Bankers Life Assn., supra; Van Norman v. Modern Brotherhood, 143 Iowa 536, 121 N. W. 1080; Scott v. Woodmen of World, 149 Iowa 562, 129 N. W. 302.

II. One ground of appellant's motion for new trial was misconduct of the jury during its deliberations. This was supported by affidavits of two jurors to the effect that the jurors had discussed an alleged offer of compromise settlement made by appellant to appellee and that their verdict was influenced thereby. Affidavits to the contrary were made by seven jurors. In this state of the record we are not inclined to interfere with the order overruling this ground of the motion. No abuse of judicial discretion appears. Aken v. Clark, 146 Iowa 436, 442,

14

123 N. W. 379, 381; Hoyt v. Hoyt, 137 Iowa 563, 567, 115 N. W. 222, 224; State v. Billberg, 229 Iowa 1208, 1222, 296 N. W. 396, 404.

III. Decedent's application to appellant for one of the policies showed the cause of death of one of his brothers was "suicide."

During the trial appellant asked a doctor the following question:

"Q. Doctor, from your experience, observation and study as a physician and specializing in mental and nervous diseases, is it your opinion that there exists a family predisposition to suicide or not?"

The court sustained appellee's objection to the question and to appellant's offer to prove the doctor, if permitted, would answer "Yes."

From the question itself it is not clear whether the word "family" was used in the sense of a household, a group closely related by blood, or in some other sense. However, we will assume the word, as used, included Mr. Brown and his brother. The inquiry was not limited to persons having common traits, ailments, taints, or weaknesses. Nor was the asserted predisposition attributed to heredity, environment, or any other cause. It is appellant's theory that the testimony was proper as tending to establish the probability that because decedent's brother, under circumstances not shown, had performed an unnatural act, decedent later performed the same act under the circumstances shown in the record.

We are satisfied the court was right in refusing the proffered testimony. It may be likened to an offer to show in the trial of one charged with larceny that he is probably guilty because his brother previously committed larceny. It is of interest to note that appellant issued Mr. Brown most of the insurance involved in this suit after appellant learned of the suicide of his brother.—Affirmed.

HALE, STIGER, BLISS, and GARFIELD, JJ., concur.