CRYSTAL K. HOLLOWAY, appellee, v. BANKERS LIFE COMPANY, appellant.

No. 49043.

(Reported in 81 N.W.2d 453)

518

March 5, 1957.

Herrick, Langdon & Sidney, of Des Moines, for appellant.

Theodore T. Duffield and James A. Lorentzen, both of Des Moines, for appellee.

Bliss, C. J.—The insurance policy, issued October 16, 1954, provided that the insurer, immediately on receipt of due proof of the death of the insured, while the policy was in full force, would pay to the beneficiary $5000. The insured elected to pay the annual premium of $138.05 in quarter-annual payments of $36.25. He had paid the first of these installments, which would have maintained the policy in force to January 16, 1955. His death occurred on December 4, 1954. The policy was not issued on the solicitation of the insured. The moving party in the sale of the policy was an insurance salesman of the appellant, who contacted the insured upon learning that he had purchased a new home. The salesman called the insured by telephone on October 5, 1954, for an appointment on October 10. The insured did not purchase a policy at that time, but final arrangements

were made on October 13, 1954, and the first-quarter payment of the premium was made when the policy was delivered to the insured.

The insurer having denied any liability under the policy on January 13, 1955, the beneficiary filed her petition on January 17, 1955. The policy provided that if the insured died prior to October 16, 1975, the insurer would pay a monthly income of $50 to the beneficiary up to that date and at that time pay a final sum of $5000. This was the ordinary life portion of the policy and under it plaintiff claimed $200 for four monthly payments of $50 each. The policy also provided that if the insured's death resulted, directly and independently of all other causes, from bodily injury effected solely through external, violent and accidental means, the insurer would pay an additional amount of $5000. With reference to this additional $5000, the policy provided that: "The additional amount provided for above will not be paid if the insured shall die as a direct or indirect result of one or more of the following, which are risks not assumed: Suicide, whether sane or insane; * * *."

The general provisions of the policy provided: "Suicide: If the insured shall die by suicide, while sane or insane, within two years from the date of issue hereof, the amount payable to the beneficiary under this policy shall be the sum actually received by the company for premium payments hereon without interest, and no more."

Plaintiff alleged that the death of the insured was accidental. Defendant by answer admitted the issuance of the policy, but denied that the death of the insured was accidental, and for a separate defense to that portion of the claim based on the ordinary life portion of the policy pleaded that the insured died by suicide, and further denied all further liability to the plaintiff, except for the obligation to return the premium.

As stated by appellant, the questions presented on the appeal include: whether or not the court erred in overruling motions of defendant for a directed verdict, whether or not the court erred in rulings on evidence, and whether or not the court erred in certain instructions to the jury.

The insured was born at Lamoni, Iowa, August 21, 1925. He was about five feet and nine inches in height, weighed about

145 pounds, and was right handed. After his marriage to plaintiff on January 21, 1946, and thereafter, for nine months he attended Graceland College in Iowa. The couple then moved to Yakima, Washington, where he remained for five years in the employ of the Standard Oil Company, when he returned to Des Moines, Iowa, as a salesman for Standard Oil Company. In January 1954 he became the operator of the station of that company at 4108 Fleur Drive in Des Moines. After living in rented properties for some time the couple bought a home at 6115 Boston located in northwest Des Moines, a few blocks west of Merle Hay Road. The purchase was made about three or four months before Mr. Holloway's death. Two daughters were born of the marriage, Kathy and Nancy, respectively about eight and four years old at the time of his death.

He and the plaintiff were reared at Lamoni, Iowa, and attended grade and high school together. He came from a good family and was the youngest of six children. He was an athletic young man and participated in all school activities and outdoor sports. In his senior year in high school he won an award for outstanding athletics. He was a good student, well liked, and in turn liked everyone. His father was still an active minister at the age of 78 years at the son's death.

The insured went into the U. S. Navy after graduating from high school and served overseas around Manus Island. He was a strong, able-bodied man, and always enjoyed good health. He was of a pleasant, congenial, friendly nature and disposition, liked by all who contacted him, and never showed any indication of worry, despondency or discontent. This was true at all times up to the time of his death. Many witnesses so testified. In fact there was no evidence to the contrary. We give some excerpts of testimony respecting his uniformly happy nature and conduct, which are typical of all the testimony:

Robert Welty, a salesman from Winterset, first met Mr. Holloway a year and a half previous to his testifying and stopped frequently at his station because he liked him. One of these occasions was at 7 p.m. December 3, 1954, the evening before his death. The insured was feeling happy over the business he was doing. Asked as to his general disposition, the witness said: "He was a pretty happy sort of a fellow. I think

everybody liked him. He seemed to get along with everybody pretty well. I believe he got a kick out of life, I really do."

William Bemis had patronized the insured since July 1954 and stayed at his station from 7:30 p.m. to 9 p.m. on December 3, 1954, having his car washed and greased. He testified that "he liked Holloway very much, he had a pleasing personality, always had something to say, had a splendid disposition and didn't appear that night any different than on other occasions, and made arrangements that night to pick up his car (the witness's) the following morning at 8 or 9 o'clock."

Another witness testified that he passed the insured's station between 11:30 and twelve o'clock on the night of December 3, 1954, and as was his custom he honked his horn when Bob was out there, and "he acknowledged my horn with a wave and a smile."

The insured and the plaintiff arose at about 7:30 a.m. on the morning of December 3, 1954. One of them took the daughter Kathy to school. Later they went to a garage to get the car which was there for repairs. He then went to his station and his wife saw him there about noon, and then never saw him again until about one o'clock that night at her mother's restaurant where she was helping. He did not appear worried or depressed and did not mention anything bothering him. Throughout the day and night of Friday, December 3, 1954, and prior to the time he met his wife at the restaurant, Mr. Holloway operated his station and contacted many customers, twelve of whom testified that he was just as cheerful that day as he had been previously. As one stated: "He seemed to be that way all of the time; just his nature." Another said: "He was always sort of smiling, that is the one thing I noticed * * * he had a pleasing personality." The witness Seery said Holloway stopped that afternoon to collect an account, and that he was a "happy-go-lucky type of guy and on the third of December appeared as usual."

An attendant at the station testified that he "was around Bob all of the time, that he was friendly, talkative, a good mixer and always had appeared to be happy, and on the third day of December he didn't mention anything as bothering him and was his usual good-natured self."

A witness to whom Holloway, after servicing a car, delivered it about 4 p.m. on Friday, stated that he appeared unworried as usual, "a very jolly fellow who always had some little kidding remark to make, and didn't seem serious about anything."

William Emerson who often hunted with Holloway testified that the latter talked to him between 6:30 and 8:30, the evening of December 3, 1954, and asked him to go duck hunting with him the next morning, which invitation the witness could not accept. Of Holloway's attitude on this occasion, the witness said "he didn't disclose any worries, and that he was an awfully happy-go-lucky kid, and mixed well with people and seemed to enjoy life awfully well."

There was testimony that there was a mutually loving attachment between Mr. Holloway and his children.

Officers Devine and Thiel of the Des Moines Police Department were in the restaurant of the mother of Mrs. Holloway when the insured came in for his wife between one and two o'clock in the morning of December 4, 1954. Both officers observed the insured talking with his wife and testified that he did not appear to be depressed or worried, and they noticed nothing unusual about his actions or any quarreling between the couple. Mr. and Mrs. Holloway left the restaurant in separate cars. Mr. Holloway arrived at their home about five minutes before his wife. The children were asleep in their bedroom. Sharon McKinney, a 15-year-old girl, was sitting with the children. She had not met Mr. Holloway before. He announced himself to her as "one of the family", and asked her how much he owed her and when she told him it was $3 he gave her a five-dollar bill and said she could pay him the change the next time she came.

In a letter to Mrs. Holloway, postmarked December 18, 1954, Miss McKinney enclosed two dollars.

The Holloway one-story home at 6115 Boston was on the north side of the east-west street which it faced. The front entrance to the home was into the living room, the east room. A hall extended from this room to the west wall of the house. Just west of the living room was the bathroom, and the next

room west of the bathroom was the children's bedroom. Across the hall to the north from the children's bedroom was the bedroom of the parents, and just east of this room and across the hall from the bathroom was the children's playroom, immediately east of which was the kitchen.

Mr. Holloway came home with his work clothes on, soiled with the products which he handled. Mrs. Holloway testified that they sat for awhile in the front room and chatted a little when her husband said he was going hunting in the morning. She told him she wished he would not go hunting as he had to go to work by eight o'clock in the morning, and work all day until late Saturday night and it would be too tiring. She did not convince him and as he left the room he said he was going hunting. He went down the hall and she saw the playroom light come on. There was a closet in the playroom, which had a sliding door, in which her husband kept his hunting equipment. When he went hunting in the mornings, he would collect his equipment the night before and put it in a corner of the kitchen, so that he could leave quietly without waking anyone. Mrs. Holloway heard the playroom closet door slide open and she knew then that he was going hunting. She next heard the discharge of the gun. Asked how soon the discharge was after she heard the sliding closet door open, she answered: "It was just right away, because I was planning on going in and putting some coffee on, which was usually our habit to sit there and have some coffee when he worked late, and I didn't have a chance to do that."

Mrs. Holloway had been hunting with her husband occasionally and she was familiar with how the slide of the gun was moved back and forward to load it. She heard no such sound, but only the sound of the discharge shortly after she heard the closet door open. She ran into the playroom at once and saw her husband lying on the floor. She immediately telephoned and asked the operator to connect her with the police. She testified:

"I just asked her for help and I believe she connected me with the police. It seems I gave some man my address.

"Q. And might you have said, 'My husband shot himself'? A. Yes, I did.

"Q. And when you said, 'My husband shot himself', did you have any intention to indicate that he intentionally shot himself? A. Oh, no."

On objection the last answer was stricken.

On re-cross-examination she was asked: "When you called your mother, you said, 'My God, Mama, Snipe shot himself'? and she answered, 'That's right'." Snipe was a nickname for the insured.

About a month before the insured's death he and his wife had a quarrel, and were separated for about a week, during which time he was away from home at night, but he brought a check home, and came out again to get the dog and went hunting. On his return with the dog he brought home some game which he had shot and he cleaned it in the kitchen, with his wife and children present. Shortly after he and his wife were at her sister's home and a reconciliation was effected, and he returned home with his family. Mrs. Holloway testified:

"Q. And that was the end of it? A. Yes, that was the end of it.

"Q. Were you happy with him? A. That's right.

"Q. Did he appear to be happy with you? A. Very. He was very glad to get back home.

"Q. Did you have any other differences after he came back? A. No, not after he came back."

Mr. Holloway had financial obligations. He borrowed money when he obtained his service station. At his death there was a balance due the Standard Oil of $6584.76 on a note, $1824.44 on his open account, and $14 on a credit card account. The note was payable at the rate of $221.17 a month on a liquidation of 1½ cents per gallon sold by him. At his death the company was holding his check of November 22, 1954, for $673.37, which had been returned for insufficient funds. In November 1954 he paid $303.36 on his note and was current on his payments. This testimony was given by a witness for the defendant who was connected with Standard Oil, who also stated that it was not an unusual occurrence for Holloway to be overdrawn, and then to catch up with his daily receipts, and that the company was

"very well satisfied" with him as a station operator and considered him a good account. Nine of his checks payable to Standard Oil Company, bearing dates from October 27 to November 29, 1954, totaling $2801.63, bearing "paid" stamps not later than December 3, 1954, were in evidence, showing gasoline purchased during that period. The checks had been cashed.

Other debts owing by the insured at his death were: a G. I. mortgage of $12,000 on his home, the monthly payment on which including insurance and tax was $80.36; $282.27 payable to Northwest Finance Company at $17.20 a month; West Des Moines State Bank, $1066.59 secured by three chattel mortgages on vehicles, on which his payments were current; Universal C. I. T. Credit Corporation on a conditional sales contract which had been reduced since 1953 from $2157.12 to $1059.52; he had borrowed $600 from a family friend, which he had offered to pay a number of times. On December 4, 1954, he owed the Capital City State Bank $678.65 on a note dated September 24, 1954, for $814.39, payable in twelve installments of $67.87 each. He was not delinquent in the payments.

His father testified: "I have discussed financial problems with Bob and we had an understanding. The discussion was regarding any money that he needed, and he came to me at times and I backed him financially with my credit at the bank. He knew that he was free to ask me at any time and I never refused him. * * * there was no one that seemed to have anything but the kindest feelings for him and he towards them. * * * I never saw Bob when he appeared down in the mouth, worried or in despair. * * * He was always optimistic and never deeply worried about anything. He so appeared the last time I saw him on Saturday, following Thanksgiving."

Asked if he knew of the week the Holloways lived apart, the father testified: "Yes, he talked very frankly with me and I talked frankly with him. It wasn't of that nature that it couldn't—the breach wasn't so wide that it couldn't be healed over. He told me that he had made a proposition to his wife and that she had gladly accepted it. The family relationship appeared to be well healed at that time."

The insured did much hunting. He was familiar with guns and had other guns in the playroom closet. His great grandmother Holloway was a niece of Daniel Boone. The shotgun, the discharge from which caused his death, had been given to him by his father and had been used when the latter received it. An experienced gunsmith, testifying for plaintiff, took the gun apart. It was his judgment that "the state of the general repair of the gun was exceptionally poor. By all standards, accepted in the trade as to safety standards, the gun would have been absolutely irrepairable. * * *In other words, it would be considered unsafe by any gunsmith or factory. * * * We would not consider it in the trade to be safe for use in the field or general use of the gun. * * *Q. Now is it possible for a gun in the condition of this gun to be fired by a jar or jolt? A. I would say it would be possible to fire the weapon by a sufficiently hard bump or if the weapon were dropped, especially butt first. They have been known to be fired that way, and this particular gun, I would say, could be fired that way. * * * It was because of some possibility of defective sear engagement in this gun that I say the gun might be fired with a jolt."

A witness for defendant who had made a study of firearms testified: "I would say the over-all condition of this gun is not particularly good. The union between the barrel and the stock portion of the firing chamber is loose and worn. The trigger pull is approximately a pound light. It is a gun that I would describe as not too bad, but certainly not good. * * * I did make experiments and attempt to set the firing mechanism off by jarring the gun. * * * In other words, I treated the gun very roughly, throwing it around, and I was unable to make it fire, even though the safety mechanism was in position for firing." The witness was not permitted to give an opinion whether the discharge of the gun was accidental or deliberate, but he expressed his belief that it was self-inflicted. On cross-examination he was asked: "Then the fact that the gun didn't go off once it was cocked wouldn't mean that it might not go off with a jar the second time it was cocked, isn't that true?" He answered: "That again, of course, would certainly be true of this weapon. It might also be said of any weapon, new or

used. " There was opinion testimony that the muzzle of the gun may have been but a few inches from the insured's head when it was discharged.

There was little other evidence bearing upon the family life or relationship of Mr. and Mrs. Holloway. There was testimony of a policeman that he saw the insured one night in his car near his home and he told the policeman he "didn't want to go home and get into an argument." Also testimony that in driving his car one night there was an accident with a group of soldiers. He was worried about it until he learned no one was hurt.

I. The appellant assigns nine errors as grounds for reversal. Errors I and II are based upon the overruling of its motion for a directed verdict for the reason that the evidence showed as a matter of law that the insured died by suicide, and in overruling its motion for judgment notwithstanding the verdict for the reason the plaintiff failed to sustain by sufficient competent evidence the burden of proof to show the death of the insured was the result of accident. Both motions are based upon substantially the same grounds. We find no merit in either motion. Without further discussion of the facts we are convinced that the issues involved in the motions were questions of fact for the determination of the jury, and that the evidence sustains the jury's verdict. It is undisputed that the death of the insured was caused by external and violent means. The evidence created a jury question on the issue of accidental death.

It is the well-settled law of Iowa that in passing upon a motion to direct a verdict against the plaintiff, the court must view the evidence in the light most favorable to the plaintiff, and every inference reasonably permissible must be carried to the aid of the evidence. Becker v. City of Waterloo, 245 Iowa 666, 673, 63 N.W.2d 919; Bauer v. Reavell, 219 Iowa 1212, 1219, 1220, 260 N.W. 39; Huffman v. King, 222 Iowa 150, 157, 268 N.W. 144.

In the absence of direct evidence a presumption arises that a wound was not intentionally inflicted either by the insured or by another. Brown v. Metropolitan Life Ins. Co., 233 Iowa 5, 10, 7 N.W.2d 21; Allison v. Bankers Life Co., 230 Iowa 995, 999, 299 N.W. 889; Reddick v. Grand Union Tea Co., 230 Iowa

108, 118, 296 N.W. 800, 804: "If the facts surrounding death can be reconciled with any reasonable theory of innocence or accidental cause, that explanation will be adopted."

II. Appellant contends that the court erred in denying the coroner, Dr. Walter D. Anderson, as an expert, to testify that the wound was intentionally self-inflicted and that the insured committed suicide. The objection to the question that it called for an opinion and conclusion of the witness without any foundation or basis and was a direct invasion of the province of the jury was properly sustained. The knowledge of the coroner was gained solely from an examination of the body and from conversations with the deputy sheriffs. He did not interview any persons who had been with the insured during the day prior to his death. He held no inquest and made no attempt to ascertain the insured's state of mind preceding his death. Any opinion he might have given was based largely on hearsay statements of the sheriff's deputies. He filed in the sheriff's office a report of his conclusions based solely on this hearsay information and his examination of insured's body. His stated conclusion that the wound was self-inflicted was not objectionable but his opinion that it was deliberate and intentional was properly stricken. Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N.W.2d 646; Halligan v. Lone Tree Farmers Exchange, 230 Iowa 1277, 300 N.W. 551.

III. Error is assigned for the rejection of his report which was filed with or given to the sheriff, stating his conclusion that the insured came to his death by suicide. It was not admissible for the reasons stated in the preceding division hereof.

IV. The coroner's certificate of death and the certified copy of his report filed with the clerk of the court, both of which stated that the death of the insured was due to an intentionally self-inflicted wound, and that his death was suicidal, were rightly rejected. Morton v. Equitable Life Insurance Co., 218 Iowa 846, 851 et seq., 254 N.W. 325, 96 A. L. R. 315; Blakeley v. Estate of Shortal, 236 Iowa 787, 793, 20 N.W.2d 28; Wilkinson, administrator, v. National Life Assn., 203 Iowa 960, 967, 968, 211 N.W. 238; Omaha & Council Bluffs St. Ry. Co. v. Johnson, 109 Neb. 526, 529, 191 N.W. 691, 693: "In a controversy between individuals, where the cause of death is a

material issue, such certificate has no direct evidentiary value on that issue, and its recitals must be disregarded by this court." See also 28 A. L. R.2d 352, 354; 58 Am. Jur., Witnesses, section 622, page 344.

█ V. Shortly after Mrs. Holloway reported the death of her husband to peace officers, two or three deputy sheriffs arrived at the Holloway home. Deputy Lamphere, as a witness for plaintiff, testified to the conditions he found there. He also testified to his acquaintance with the insured and his friendly nature. On cross-examination he testified that Mrs. Hartley, the mother of Mrs. Holloway, had arrived at the home when he reached it. He was asked, "And it is true, isn't it, that you did talk to the mother there? A. I did.

"Q. And that her mother advised you that he had threatened to commit suicide three weeks before this date but his wife talked him out of it?

"Mr. Duffield: Just a moment, now, Your Honor, may I ask a question here? The Court: 'Oh, yes'.

"Q. Officer Lamphere, were your conversations, if any, with the mother of Mrs. Holloway in the presence of Mrs. Holloway? A. No, sir."

The court sustained plaintiff's objection that any attempts to bring forth any declarations of the mother of Mrs. Holloway were incompetent, irrelevant, immaterial and hearsay, and not a part of the res gestae and improper cross-examination, not having been gone into on direct.

Deputy Lamphere was later recalled for further cross-examination, at which time he had with him a written report which he had made out at the Holloway home at the time he was called there. In the report was this statement: "He (Holloway) told his wife, Crystal, three weeks ago that he was going to kill himself. His wife talked him out of it."

The report was objected to as incompetent, irrelevant and immaterial, and contains reference to hearsay matters, and conclusions based on hearsay, and is improper as any part of cross-examination. The objections were sustained and we think rightly.

█ VI. Robert Seery, on cross-examination by defendant,

testified that he was at the insured's service station on December 4, 1954, and had a conversation with Gerry Harker. The witness was asked, "It is true, is it not, that Mr. Harker told you that he had stayed up all night with Mr. Holloway, the time before when he had threatened to shoot his head off, and prevented him from doing so? A. That's right."

The court sustained the objection to the testimony on the ground that it was incompetent, irrelevant and immaterial, calling for hearsay testimony, not any part of the res gestae, and improper cross-examination.

We think the offers of testimony noted in Divisions V and VI on the objections made were properly rejected. The declarations and assertions of Mrs. Hartley and of Gerry Harker, as testified to by Officer Lamphere and by Seery, and the written report by Lamphere were not admissible as hearsay or res gestae, and for other grounds urged. The testimony and the written report of Lamphere were not brought within any exceptions to the hearsay rule. Rand v. Ladd, 238 Iowa 380, 26 N.W.2d 107; Mitchell v. Montgomery Ward & Co., 226 Iowa 956, 285 N.W. 187; 20 Am. Jur., Evidence, section 454, page 403; Handbook of the Law of Evidence (Charles T. McCormick, 1954) Title 9, The Hearsay Rule and its Exceptions, page 460, section 225.

■ Res gestae statements must relate to and be explanatory of the principal incident or transaction, and made under circumstances as to reasonably show they are spontaneous. The narrations offered do not meet this test. Aldine Trust Co. v. National Benefit Accident Assn., 222 Iowa 20, 23, 24, 268 N.W. 507; Westcott v. Waterloo, Cedar Falls & Northern Ry. Co., 173 Iowa 355, 362, 155 N.W. 255; McQueen v. Safeway Stores, 214 Iowa 1300, 1302, 1303, 244 N.W. 278.

VII. Appellant complains of the restricted cross-examination of Deputy Sheriff Lamphere with respect to the written report he had given to the sheriff. This report was in substance a restatement of testimony offered by him, and rejected, because it was hearsay and contained the statement that Holloway had committed suicide. We think the court did not err in its rulings.

■ VIII. This complaint of appellant is based on Instruction No. 6 of the court that the presumption against suicide

has the effect of affirmative evidence and in overruling exceptions to the instruction and motion for new trial asserting error. Appellant cites 158 A. L. R. 748; New York Life Ins. Co. v. Gamer, 303 U. S. 161, 58 S. Ct. 500, 82 L. Ed. 726, 114 A. L. R. 1218; Jefferson Standard Life Ins. Co. v. Clemmer, 4 Cir., Va., 79 F.2d 724.

The holdings of this court are contrary to appellant's contention. Brown v. Metropolitan Life Ins. Co., 233 Iowa 5, 10, 7 N.W.2d 21; Allison v. Bankers Life Co., 230 Iowa 995, 999, 299 N.W. 889; Dewey v. Abraham Lincoln Life Ins. Co., 218 Iowa 1220, 1225, 257 N.W. 308; Martin v. Bankers Life Co., 216 Iowa 1022, 1040, 250 N.W. 220.

It is our conclusion that there is no prejudicial error, and the judgment is—Affirmed.

OLIVER, GARFIELD, WENNERSTRUM, HAYS, THOMPSON, LARSON, and PETERSON, JJ., concur.

SMITH, J., concurs in result.